IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:21-CV-197-FL

| | |
|---|---|
| KEVIN J. LABUDDE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | ORDER |
| ) | |
| THE PHOENIX INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on defendant's motion to dismiss in part pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (DE 15). The motion has been briefed fully, and the issues raised are ripe for ruling. For the reasons that follow, the motion is granted in part and denied in part.

### STATEMENT OF THE CASE

Plaintiff commenced this action September 9, 2021, in the Superior Court of Sampson County, North Carolina, by verified complaint alleging that defendant, which provided a homeowners insurance policy for plaintiff's home in Stedman, North Carolina, had breached that insurance policy, engaged in unfair claims settlement practices in violation of N.C. Gen. Stat. § 58-63-15, and operated in bad faith in its dealings with plaintiff in violation of common law.[1]

---

[1] Plaintiff initially named a number of other entities as defendants that he asserted "operated in a combined and concerted manner" such that they had "disregarded corporate formalities in a deceptive way" and "should be treated as a single actor." (Compl. ¶ 4). However, all other defendants were dismissed by plaintiff's post-removal stipulation of dismissal. (DE 8).

Defendant removed the case to this court November 12, 2021, and then moved to dismiss all but one of plaintiff's claims, for failure to state a claim under Rule 12(b)(6).

As evidenced by defendant's amended notice of removal, (DE 12), plaintiff attaches a number of documents to his complaint: 1) the renewal policy declarations for plaintiff's insurance policy; 2) a claim under that policy numbered H2W3111 (the "H2W3111 claim"); 3) a notice of inspection by defendant for the H2W3111 claim; 4) a letter from defendant denying the H2W3111 claim; 5) a letter from plaintiff to defendant purporting to appeal that denial; 6) a contract between plaintiff and Southeast Foundation & Crawl Space Repair Inc. ("Southeast Foundation & Crawl Space Repair"); 7) a service agreement between plaintiff and 911 Restoration of Fayetteville, NC; 8) a claim, under plaintiff's policy, numbered IGM2624 (the "IGM2624 claim"); 9) notice of assignment of Erin Karaffa ("Karaffa"), employed by defendant, to the IGM2624 claim; 10) emails between plaintiff and Karaffa; 11) emails from plaintiff to Blake Mayberry ("Mayberry") of Vertex Engineering, PC ("Vertex Engineering"); 12) defendant's estimate as to damage to plaintiff's home; 13) a notice of nonrenewal of plaintiff's policy with defendant; and 14) a report by employees of Probuilders of the Carolinas, Inc. ("Probuilders of the Carolinas"), regarding damage to plaintiff's home. In support of its motion, defendant relies upon a report by employees of Vertex Engineering and further emails between plaintiff and Karaffa.

## STATEMENT OF FACTS

The facts alleged in plaintiff's complaint may be summarized as follows. Plaintiff owns a home in Stedman, North Carolina, which was insured under a homeowners insurance policy (No. 980780039 633 1) by defendant during the pertinent time period. (See generally Renewal Policy Declarations (DE 12-2) at 1). The residence was custom built for plaintiff in 2005.

2

A.      Hurricane Matthew and the H2W3111 Claim

In October 2016, Hurricane Matthew passed through North Carolina and caused damage to plaintiff's home, among other places. Plaintiff made a claim to defendant regarding this damage, the H2W3111 claim, under his policy in early 2017. Defendant sent Jim Visconti ("Visconti") to inspect plaintiff's home. On the basis of Visconti's inspection, in February 2017, defendant denied plaintiff's claim because, in its determination, the damage to plaintiff's roof did not exceed his deductible and the mold damage to plaintiff's crawlspace was not covered under his policy. Plaintiff sent a letter to defendant expressing his "severe[] disappoint[ment]" in how the claim "was handled" and purporting to "appeal the findings" in the denial. (H2W3111 Letter (DE 12-6) at 1-2; Compl. ¶ 18). Plaintiff did not receive a response.

In April 2017, plaintiff contracted with Southeast Foundation & Crawl Space Repair "to fully encapsulate the crawlspace" for $14,784.30. (Compl. ¶ 19; Southeast Foundation & Crawl Space Repair Contract (DE 12-7) at 1). Southeast Foundation & Crawl Space Repair allegedly failed to remove "topical mold" in the crawlspace, requiring plaintiff, in June 2018, to contract with 911 Restoration of Fayetteville, Inc. to remove the mold for $8,354.88. (Compl. ¶ 21; 911 Restoration Service Agreement (DE 12-8) at 1). Still, the "topical mold in the crawlspace" was not "addressed" fulsomely, and plaintiff was required to fix the issue himself, spending over "$30,000 in materials and equipment" and "countless . . . hours" in labor. (Compl. ¶ 22).

B.      Hurricanes Florence and Dorian and the IGM2624 and IGM8299 Claims

Hurricanes Florence and Dorian made landfall in North Carolina in September 2018 and September 2019, respectively. In December 2019, plaintiff discovered that "his roof was actively leaking in multiple areas," including into "his walls" and "through the windows," which experts hired by plaintiff later determined "was more than likely caused by Hurricane Florence." (Compl.

3

¶¶ 23, 49). Plaintiff submitted a claim that same month, the IGM2624 claim, to which Karaffa was assigned.

Karaffa came out to inspect the property and shot footage from an aerial drone, and plaintiff provided what he asserts was "detailed evidence" of the leaks and damage, which he also sent by email. (Compl. ¶¶ 28-29, 42; Dec. 20, 2019, Email (DE 12-11) at 2-4 (including a number of pictures of alleged mold damage)). Defendant approved a roof replacement that day and informed plaintiff "that he would receive a roof estimate by December 23, 2019." (Compl. ¶ 30). Plaintiff did not hear from defendant until January 5, 2020, when Karaffa left a voice mail that "she was in the process of hiring an engineer 'to help us assess everything that is going on in [plaintiff's] house.'" (Id. ¶ 31). On January 10, 2020, plaintiff received a call informing that Vertex Engineering had been hired "to 'find out where the moisture was coming from.'" (Id. ¶ 32). On the same call, plaintiff notified defendant that he had recorded a video of water coming from the roof and seeping into the walls, a video which plaintiff was allegedly informed would be considered in determining his claim.

In mid-January 2020, Mayberry, of Vertex Engineering, made contact with plaintiff. Plaintiff was allegedly forced to clarify for Mayberry that the problems with the home were not just "some issues with mold" but rather "a leaky roof." (Id. ¶¶ 33-34). Mayberry visited plaintiff's home for a physical inspection, after which plaintiff sent further evidence purporting to demonstrate the leaking roof to Mayberry and to Karaffa. On February 3, 2020, Karaffa informed that Mayberry was "working as fast as he can to finish the report" and that Karaffa had been told she "should hear back from [Mayberry] in the next day or two." (Feb. 3, 2020, Email (DE 12-14) at 1; Compl. ¶ 37). Four days later, plaintiff notified Karaffa that he had found shingles blown off of his roof and that his home was "having odd electrical problems," (Feb. 7, 2020, Email (DE 12-

4

15) at 1), which plaintiff alleges were the result of "the top-down water infiltration from the leaking roof" into "the walls where the wiring is housed," (Compl. ¶ 38).

Having not heard from Karaffa, on February 18, 2020, plaintiff contacted defendant, through Karaffa and her supervisor Gregory Maybin ("Maybin"), expressing "his displeasure" with, inter alia, the perceived delay in his claim being resolved. (Compl. ¶ 39; see also Feb. 18, 2020, Email (DE 12-16) at 2). That same day, Karaffa sent plaintiff Mayberry's report, dated 11 days earlier, and stated she would call plaintiff the next day. (Compl. ¶ 40; see also Vertex Engineering Report (DE 15-1) at 2). Karaffa called plaintiff February 19, 2020, allegedly admitting she had delayed in sending the report. She also asserted that while plaintiff's roof had been damaged by hail, the "other water damage" was caused by "an 'improper house wrap installation.'" (Compl. ¶ 41). After this phone call, plaintiff requested the drone footage from the December 20, 2019, inspection, which Karaffa stated she would send that weekend.

On March 7, 2020, plaintiff sent an email to Karaffa and Maybin which allegedly had appended to it further evidence of damage to his home. Having not received a written acknowledgement of receipt of that email as requested, plaintiff emailed again on March 9, 2020, asking for that acknowledgment. In response, Karaffa called plaintiff and allegedly informed plaintiff that "information and documentation sent by him would not be considered . . . because he was not an expert," but that his roofing estimate would be sent soon. (Id. ¶ 44).

On March 10, 2020, Karaffa emailed plaintiff, transmitting the drone footage and an estimate of the cost to replace the house's roof ($19,720.56) and the roof of a shed on plaintiff's property ($1,701.68). (Compl. ¶ 45; Karaffa's Mar. 10, 2020, Email & Materials (DE 12-21) at 5, 29). Karaffa also noted that she would be "reporting [a] second claim for plaintiff," (Karaffa's Mar. 10, 2020, Email & Materials (DE 12-21) at 6), which had been described to plaintiff as a

5

"mold remediation claim," (Pl.'s Mar. 10, 2020, Email DE 12-22) at 1). This claim was assigned "Claim Number IGM8299," (the "IGM8299 claim"), and had a "reported loss date of December 14, 2019." (Compl. ¶ 46). Two days later, Karaffa informed plaintiff she was working on his "second claim" for "an active leak" and would contact him the next day. (Id. ¶ 47).[2] Defendant did not contact plaintiff again.

Instead, when plaintiff went to renew his policy in 2021, he was denied coverage on the basis of "water damage" with a date of loss of December 14, 2019, and damage caused by hail with a date of loss of August 7, 2019. (Compl. ¶ 48; Nonrenewal Notice (DE 12-23) at 1). Plaintiff has been unable to obtain insurance for his residence as a result of the IGM8299 claim. (Compl. ¶ 48). Plaintiff sought his own evaluation of the damage to his home and received a report from employees of Probuilders of the Carolinas that the damage he discovered in December 2019 "was more than likely caused by Hurricane Florence." (Compl. ¶ 49; see also Lewis O'Leary & Daniel Smith's Report (DE 12-23) at 13). He also received an evaluation by "Greenhill Restoration" that the home is "a total loss" and that it would take "more than $600,000 . . . to place [plaintiff] in the position he was [in] prior to Hurricane Florence." (Compl. ¶ 50).

**COURT'S DISCUSSION**

A.  Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level."

---

[2]   Although it is not evidenced in the record, defendant claims that the IGM8299 claim has been "deni[ed]" on the basis of Mayberry's report, (Def.'s Mem. (DE 16) at 13-14 (explaining that defendant "relied on the opinion of an independent engineering expert" "[i]n declining to pay the [IGM8299] [c]laim")), to the apparent surprise of plaintiff, who allegedly only learned this through defendant's memorandum in support of its motion.

Twombly, 550 U.S. at 555.  In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the [the non-movant]," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments."  Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).[3]

B.  Analysis

Defendant seeks to dismiss any cause of action by plaintiff that is based on the H2W3111 claim and any claim of unfair claims settlement practices or bad faith but not plaintiff's claim for breach of contract as ostensibly arising from IGM8299 claim.  Plaintiff clarifies in his response that he "does not assert he has viable legal claims related to the [H2W3111] [c]laim."  (Pl.'s Resp. (DE 21) at 7).

Moreover, insofar as defendant's motion to dismiss plaintiff's claim for bad faith is premised on defendant's contention that it "is solely based on the [H2W3111] [c]laim," (Def.'s Mem. (DE 16) at 8 n.3), defendant misses the mark.  The complaint does denominate the H2W3111 claim as "the 'Claim'" and describe defendant's "refusal to timely and promptly adjust and pay the Claim" as "constitut[ing] bad faith."  (See Compl. ¶ 14, 68).  However, the complaint, fairly read as a whole, alleges common law bad faith by defendant in refusing to timely and promptly adjust and pay the IGM2624 and IGM8299 claims.  (See, e.g., id. ¶ 26 (denominating the IGM2624 claim as "the 'Subject Claim'"); id. ¶¶ 46, 48 (describing the IGM8299 claim as "[a] second subject claim" and "the second claim")).  Thus, plaintiff has not pleaded himself out of claim for common law bad faith, as defendant asserts.

---

[3]  Internal citations and quotation marks are omitted from all citations unless otherwise specified.

The court turns to analysis of those claims by plaintiff that are in substantive dispute.

1.      Breach of Contract Regarding the IGM8299 Claim

"Pursuant to North Carolina law, the interpretation of an insurance policy is a question of law" for the court. State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am., 343 F.3d 249, 254 (4th Cir. 2003); Accardi v. Hartford Underwriters Ins. Co., 373 N.C. 292, 295 (2020).[4] Specifically, it is a question of contract law. Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 299 (2000). "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of the contract." Wells Fargo Ins. Servs. USA, Inc. v. Link, 372 N.C. 260, 276 (2019).

As a preliminary matter, the court's review of plaintiff's claim for breach of contract is hampered by the fact that the actual policy does not seem to have made the transition from state court to this court upon removal. While the attached document to defendant's amended notice of removal is labeled "Homeowners Policy," the actual substance or text of the policy is not provided in that filing as it appears now. (See Renewal Policy Declarations (DE 12-1) at 1-14 (including and describing the policy's renewal declarations, a notice regarding certain non-covered natural disasters, a notice about billing options and disclosures, a notice about an increase in a coverage limit and premium calculation, and a privacy notice, but omitting the actual language of the policy)). However, given that defendant concedes that plaintiff has adequately stated a claim for breach of contract in part, plaintiff's briefing indicates that the exhibit as originally attached included additional language, (see, e.g., Pl.'s Resp. (DE 21) 5-6), and relevant language from a previous iteration of the policy, likely the same in substance in the instant policy, is provided in a different exhibit of the complaint, (see, e.g., Feb. 24, 2016, Denial Letter (DE 14) at 2-3), the court

---

[4]     The parties do not dispute that North Carolina law applies here.

finds dismissal on that basis unwarranted at this juncture. The court may revisit this issue upon a more complete record.

That matter aside, the parties' dispute as to plaintiff's breach of contract claim, in effect, arises from their disagreement as to the framing of the complaint. Defendant contends that plaintiff pleads separate contract claims for 2019 roof damage and for 2019 mold damage, assigned respectively, according to defendant, to the IGM2624 claim and IGM8299 claim, and that because it paid for plaintiff's roof replacement, there can be no breach of contract related to the IGM2624 claim. However, despite defendant's administrative renumbering of claims, the details of which are not disclosed in the complaint and seemingly not to plaintiff either, the complaint frames the breach of contract claim generally: defendant "fail[ed] to provide the benefits, coverage and payments due" under the contract. (Compl. ¶ 56).

It is reasonably inferable from the complaint that one such payment plaintiff avers is due is that to cover damages from "the water from his leaking roof . . . entering his walls and coming through the windows, among other areas," which he sought to evidence damage from, in part, by sending pictures and data relating to mold and mold damage. (See id. ¶ 26; Dec. 20, 2019, Email (DE 12-11) at 2-4). Plaintiff made a claim under the contract for coverage of this damage December 14, 2019, and it was initially assigned "Claim Number IGM 2624." (Compl. ¶ 26). That defendant later internally reclassified what damage alleged by plaintiff went with what claim number does not alter his allegation that damage covered by his insurance contract was not paid out under that contract by defendant, a breach of contract.

Defendant is not precluded from later arguing that its provision of payment for damage to plaintiff's roof did not breach its contract with plaintiff, but the court finds no basis now to "dismiss" any portion of plaintiff's complaint on this basis argued by defendant.

9

2. Bad Faith

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985). More specifically, North Carolina "law imposes on the insurer the duty of carrying out in good faith its contract of insurance," including the insurer's "right to effectuate settlement." Alford v. Textile Ins. Co., 248 N.C. 224, 229 (1958) ("[C]ourts have consistently held that an insurer owes a duty to its insured to act diligently and in good faith in effecting settlements within policy limits . . . .").

"To establish a claim for bad faith refusal to settle, [the insured] must show: (1) 'a refusal to pay after recognition of a valid claim; (2) bad faith; and (3) aggravating or outrageous conduct.'" Topsail Reef Homeowners Ass'n v. Zurich Specialties London, Ltd., 11 F. App'x 225, 237 (4th Cir. 2001) (quoting Lovell v. Nationwide Mut. Ins. Co., 108 N.C. App. 416, 421 (1993)). Bad faith does not arise where there is an "honest disagreement" regarding the value of a claim. Lovell, 108 N.C. App. at 421; see ABT Bldg. Prod. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 472 F.3d 99, 125 n.32 (4th Cir. 2006); Danby of N. Am., Inc. v. Travelers Ins. Co., 25 F. App'x 186, 194 n.9 (4th Cir. 2002). In this context, bad faith also does not include an "honest mistake in judgment." Abernethy v. Utica Mut. Ins. Co., 373 F.2d 565, 568 (4th Cir. 1967); see, e.g., Dailey v. Integon Gen. Ins. Corp., 75 N.C. App. 387, 396 (1985) (stating that bad faith means "not based on . . . innocent mistake"), cited with approval by Topsail, 11 F. App'x at 239.

Plaintiff fails to state a claim for bad faith refusal to settle as it relates to the damage to his roof or the damage caused by water leaking into his home, whether from the roof or elsewhere. As to the first, there can be no claim for bad faith refusal to settle based on an insurance claim the insurer does, in fact, settle by paying out an amount which plaintiff does not challenge. See, e.g.,

Seguro-Suarez ex rel. Connette v. Key Risk Ins. Co., 261 N.C. App. 200, 218 (2018); Blis Day Spa, LLC v. Hartford Ins. Grp., 427 F. Supp. 2d 621, 632 (W.D.N.C. 2006) (discussing settlement of part of a claim). As to the latter, the complaint does not plead facts sufficient to give rise to a reasonable inference that defendant recognized plaintiff had a valid claim in relation to the mold/leaking water damage but refused to pay.

Accepting the facts alleged in the complaint, defendant, from the genesis of plaintiff's claim regarding damage to his home, acknowledged the validity of damage to his roof. (See Compl. ¶ 30 (alleging after the inspection of plaintiff's home, defendant approved a full roof replacement)). However, even viewing the well-pleaded facts in the complaint in the light most favorable to plaintiff, the complaint does not allege sufficiently that defendant recognized as valid his claim for water damage within his home. Although the complaint states that plaintiff provided Karaffa with "detailed evidence to show that water [was] coming through the roof," (id. ¶ 28), it does not reflect a subjective belief by defendant, through its agents, that plaintiff had a valid claim. See, e.g., Universal Underwriters Ins. Co. v. Lallier, 334 F. Supp. 3d 723, 737 (E.D.N.C. 2018) (collecting cases).

Instead, defendant's agents throughout the claims handling process expressed doubt or confusion as to the cause of the damage to the interior of plaintiff's home. (See, e.g., Compl. ¶ 31 (alleging that Karaffa stated "she was in the process of hiring an engineer 'to help us assess everything that is going on in [plaintiff's] house'"), ¶ 32 (explaining that defendant notified plaintiff that it had hired an engineering firm "to 'find out where the moisture was coming from'"). That plaintiff alleges defendant was incorrect in not settling and failed to account for the evidence he was providing, (see, e.g., id. ¶ 32 (alleging that plaintiff told defendant he "had a video of water coming from the roof and infiltrating the walls")), does not mean he states a claim for bad faith

11

Case 7:21-cv-00197-FL   Document 37   Filed 07/08/22   Page 11 of 18

failure to settle as that cause of action has been defined by North Carolina courts. See, e.g., Cash v. State Farm Mut. Auto. Ins. Co., 137 N.C. App. 192 (2000) ("[A]n insurer may act in its own interest in settlement of the claim[.]").

Plaintiff argues that defendant recognized the validity of his insurance claim in toto by recognizing the validity of his claim for roof damage. He does not cite any law in support of this contention. Rather, what established law there is contradicts plaintiff's contention. See, e.g., Blis Day Spa, 427 F. Supp. 2d at 632 ("[T]here is no evidence that [defendant] ever recognized as valid the disputed portions of the Plaintiffs' business interruption and advertising expenses claims."). This argument, thus, provides no basis to conclude plaintiff has stated a sufficient claim for bad faith failure to settle.

Moreover, plaintiff's complaint is also bereft of allegations of the type of outrageous conduct required for this type of claim. North Carolina courts have looked for a "record . . . replete with evidence of [the insurer's] malice, oppression, wilfulness and reckless indifference to consequences." Dailey, 75 N.C. App. at 396. While plaintiff argues that the delay evidenced in the complaint demonstrates sufficiently bad faith and aggravating conduct, he cites no authority in support of this proposition. Rather, in analogous contexts, courts have recognized that "delay in investigating [a] coverage issue . . . without more[] is insufficient" to show "malice, oppression, wilfulness, or reckless indifference." Westchester Surplus Lines Ins. Co. v. Clancy & Theys Constr. Co., 683 F. App'x 259, 263 (4th Cir. 2017).

The cases upon which plaintiff relies in opposition are inapt. Despite plaintiff's citation to New Hickory Pizza, Inc. v. TIG Ins. Co., No. 5:16-CV-00164-RLV-DSC, 2017 WL 3840278 (W.D.N.C. Sept. 1, 2017), for the proposition that "[f]ailing to investigate a valid claim is evidence of bad faith," (Pl.'s Resp. (DE 21) at 17), no portion of New Hickory Pizza stands for that statement

of law. Rather, the court there concluded that plaintiff's bad faith settlement claim failed and that its "allegations of a failure to reasonably investigate are not in themselves sufficient with respect to the first element" of a bad faith claim. New Hickory Pizza, 2017 WL 3840278, at *9. Additionally, the factual context of von Hagel v. Blue Cross & Blue Shield of North Carolina, 91 N.C. App. 58 (1988), is instructively distinguishable where there, unlike what is alleged here, "defendant refused to investigate [plaintiff's] claim or consult [an expert] . . . before denying [plaintiff's] claim." Id. at 62.

In sum, on the facts currently alleged in the complaint, plaintiff fails to state a claim for bad faith refusal to settle. Defendant's motion in that part is granted, and that claim is dismissed without prejudice.

   3.  Unfair Settlement Practices

North Carolina declares as unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). "In order to establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Dalton v. Camp, 353 N.C. 647, 656 (2001). "The determination of whether an act or practice is an unfair or deceptive practice that violates [N.C. Gen. Stat.] § 75-1.1 is a question of law for the court." Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68 (2000).

Relatedly, N.C. Gen. Stat. § 58-63-15(11) enumerates, in relation to insurance law, certain unfair claim settlement practices. Gray, 352 N.C. at 68. Courts may "look[] to [N.C. Gen. Stat.] § 58-63-15(11) for examples of conduct to support a finding of unfair or deceptive acts or practices," and conduct that violates N.C. Gen. Stat. "§ 58-63-15(11) constitutes a violation of

13

[N.C. Gen. Stat.] § 75-1.1, as a matter of law." See id.; Murray v. Nationwide Mut. Ins. Co., 123 N.C. App. 1, 10 (1996) ("Violation of any form of conduct listed in § 58-63-15(11) operates as a per se instance of unfair and deceptive trade practice under N.C. Gen. Stat. § 75-1.1."); see also Elliott v. Am. States Ins. Co., 883 F.3d 384, 396 (4th Cir. 2018) ("[T]he remedy for a violation of section 58-63-15 is the filing of a section 75-1.1 claim."), aff'g 244 F. Supp. 3d 519 (M.D.N.C. 2017). However, "egregious or aggravating circumstances must be alleged before the provisions of the [N.C. Gen. Stat. § 75-1.1] may take effect." Ellis v. La.–Pac. Corp., 699 F.3d 778, 787 (4th Cir. 2012); Edwards v. Genex Coop., Inc., 777 F. App'x 613, 622 (4th Cir. 2019) ("Critically, to plead a successful [N.C. Gen. Stat. § 75-1.1] claim, a plaintiff must allege egregious or aggravating circumstances.").

Here, plaintiff's complaint relies primarily on generalized summations of allegedly unfair settlement practices, unmoored from the case, that stem from a mix of Rick Friedman and Patrick Malone's Rules of the Road: A Plaintiff Lawyer's Guide to Proving Liability, 16-17 (2d ed. 2010), section 58-36-15(11)'s text, and other sources.[5] Further, the court cannot credit plaintiff's citation to well over half of the factual matter in his complaint as constituting factual allegations sufficient to state this claim. Instead, the court considers the only particularized conduct plaintiff puts forward as supporting this claim: "that despite [p]laintiff's repeated requests, [d]efendant failed to send copies of the requested documentation and that [d]efendant explicitly refused to consider evidence [p]laintiff submitted." (Pl.'s Resp. (DE 21) at 12 (citing Compl. ¶¶ 29, 32, 36-37, 39, 42-44)). These particularized allegations most directly map on to the enumerated unfair claim settlement practices of "[f]ailing to acknowledge and act reasonably promptly upon

---

[5] The language upon which plaintiff relies also appears to be commonly used as form language in complaints for insurance disputes related to Hurricane Florence. See, e.g., Complaint ¶ 20, Misenheimer v. Nationwide Mut. Fire Ins. Co., No. 7:19-CV-252-FL (E.D.N.C. Dec. 26, 2019), ECF No. 1-1; Complaint ¶ 34, C-Co Mini Mart, Inc. v. Certain Underwriters at Lloyd's London, No. 4:22-CV-29-BO (E.D.N.C. Mar. 25, 2022), ECF No. 1-1.

14

communications with respect to claims arising under insurance policies" and "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information." N.C. Gen. Stat. § 58-63-15(11)(b), (d).

Neither the Supreme Court of North Carolina nor the United States Court of Appeals for the Fourth Circuit, when interpreting North Carolina law, have analyzed either subparagraph (b) or (d) of section 58-63-15(11) in detail. However, the court relies on the plain language of the statute and the exemplary analyses of the provisions by its sister courts in the circuit and North Carolina's Court of Appeals.

Subparagraph (b) enumerates "[f]ailing to acknowledge and act reasonably promptly upon communications" relating to a claim under an insurance policy as an unfair claim settlement practice. Courts in the state have eschewed a bright line deadline to constitute unreasonable delay, concluding for example that a delay in communication of "54 days is not enough, by itself to show an unfair settlement practice." See, e.g., First Protective Ins. Co. v. Rike, 516 F. Supp. 3d 513, 533-34 (E.D.N.C. 2021); Meadlock v. Am. Fam. Life Assur. Co., No. COA11-1009, 2012 WL 2891079, at *7 (N.C. Ct. App. July 17, 2012) (explaining that a four-month delay in communication, in and of itself, was not unreasonable and that further evidence was needed to determine whether that delay was reasonable or not). Instead, courts have looked to whether "[t]he responses were reasonably prompt under the circumstances." Federated Mut. Ins. Co. v. Williams Trull Co., 838 F. Supp. 2d 370, 423 (M.D.N.C. 2011). However, the fact that a defendant insurer "fail[s] to respond to multiple communications" militates towards a conclusion that they have not acknowledged and acted reasonably promptly upon communications. Guessford v. Penn. Nat. Mut. Cas. Ins. Co., 918 F. Supp. 2d 453, 465 (M.D.N.C. 2013).

Here, the complaint alleges some appreciable delays in transmitting certain information, (see, e.g., Compl. ¶¶ 30 n.2 (alleging an 80-day delay in receiving a "roof estimate" after a promise that he would receive it in three days), ¶ 42 (noting Karaffa's promise on February 19, 2020, to send information that weekend that was not sent until March 10, 2020)), and plaintiff's follow-up on multiple communications, (see, e.g., id. ¶¶ 30-31 (noting plaintiff following up on a communication after 16 days), ¶¶ 35-36 (noting plaintiff following up on a communication after six days), ¶¶ 38-39 (noting plaintiff following up on a communication after 11 days), ¶¶ 41-44 (noting a 19-day period of no communication)). However, the complaint does not evidence the type of complete lapse in communication other courts have focused on, see, e.g., Guessford, 918 F. Supp. 2d at 457-58, 465, or responses that were unreasonably prompt under the circumstances, given that, on the complaint, the alleged delays in communication occurred in the wake of a natural disaster with a statewide impact.

The complaint fails to state a plausible claim under 58-63-15(11)(b) for the type of unreasonable and delayed communication that rises to "conduct [that] is inherently unfair, unscrupulous, immoral, and injurious to consumers." See Gray 352 N.C. at 71.

Plaintiff's claim under section 75-1.1 for a violation of section 58-63-15(11)(d) for refusal to pay a claim without conducting a reasonable investigation based upon all available information also fails. The complaint alleges that Karaffa, late in the claim review process, informed plaintiff "that information and documentation sent in by him would not be considered . . . because he was not an expert." (Compl. ¶¶ 44). Plaintiff alleges this act by Karaffa was "in blatant violation of the [insurance] [p]olicy." (Id.). Thus, plaintiff's own complaint describes this act as a breach of contract, which "even if intentional," does not give rise to a section 75-1.1 claim. Branch Banking & Tr. Co. v. Thompson, 107 N.C. App. 53, 62 (1992); accord Edwards, 777 F. App'x at 623 ("A

16

successful [N.C. Gen. Stat. § 75-1.1] claim requires aggravating or egregious circumstances <u>accompanying</u> a breach of contract. It is not enough to allege aggravating or egregious <u>results</u> of a breach.").

The complaint does not allege facts giving rise to a reasonable inference that Vertex Engineering was "incompetent or untrustworthy," <u>DENC, LLC v. Philadelphia Indem. Ins. Co.</u>, 426 F. Supp. 3d 151, 158 (M.D.N.C. 2019), <u>aff'd</u>, 32 F.4th 38 (4th Cir. 2022), that the report it produced was "unscrupulous []or unethical," <u>Nelson v. Hartford Underwriters Ins. Co.</u>, 177 N.C. App. 595, 612 (2006), or that, in relation to section 58-63-15(11)(d) covered conduct, defendant otherwise engaged in the "type of aggravated conduct and bad faith" required for such a claim. <u>Elliott</u>, 244 F. Supp. 3d at 524.

Plaintiff's complaint fails to state a claim for unfair settlement practices. Thus, on defendant's motion, that claim is dismissed without prejudice.

## CONCLUSION

Based on the foregoing, defendant's motion is GRANTED IN PART and DENIED IN PART. (DE 15). Plaintiff's claim for breach of contract may proceed as described herein, and his other claims are DISMISSED WITHOUT PREJUDICE. The parties are DIRECTED to file, within 14 days of this order, an amended joint report and plan setting forth proposed case deadlines and limitations, in accordance with the court's February 18, 2022, initial order regarding planning and scheduling. (DE 24). Thereupon, the court will enter such further order as is warranted regarding case scheduling.

SO ORDERED, this the 8th day of July, 2022.

_____
LOUISE W. FLANAGAN
United States District Judge