IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:21-CV-197-FL-BM

| | | |
|---|---|---|
| KEVIN J. LaBUDDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| THE PHOENIX INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on (i) the motion by defendant, The Phoenix Insurance Company ("defendant"), to compel discovery responses and for reasonable expenses, including attorney's fees [DE-68] ("defendant's motion to compel"); (ii) the motion of plaintiff, Kevin J. LaBudde ("plaintiff"), for protective order and for expenses in response to defendant's motion to compel [DE-71] ("motion for protective order"); and (iii) plaintiff's motion to compel and motion for sanctions [DE-95] ("plaintiff's motion to compel").

For the reasons set forth below, (i) defendant's motion to compel [DE-68] is GRANTED IN PART and DENIED IN PART; (ii) plaintiff's motion for protective order [DE-73] is GRANTED IN PART and DENIED IN PART; and (iii) plaintiff's motion to compel [DE-95] GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I. Factual background

This case arises from issues surrounding certain damaged sustained by the home (the "Residence") of plaintiff and defendant's responsibility, if any, to reimburse plaintiff for such damage pursuant to plaintiff's homeowner's insurance policy with defendant. *See* Amend.

Complaint [DE-57] at 2.

Specifically, as relevant for the motions before the court, the undersigned notes the following factual allegations by plaintiff:

The Residence was custom built for plaintiff and was completed on or around December 12, 2005. *Id.* at ¶7. The Residence was insured by defendant at all times relevant to this matter. *Id.* at ¶8. On or around October 9, 2016, Hurricane Matthew hit North Carolina. *Id.* at ¶9. Plaintiff alleges that he "noticed a few small water stains in kitchen following Hurricane Matthew, but those were later . . . attributed to a leak from the HVAC system directly above it." *Id.* at ¶10. On February 16, 2017, after a pest control company pointed out topical mold in the Residence to plaintiff, plaintiff made a claim with defendant for damage sustained by Hurricane Matthew with claim number H2W3111 ("2017 Claim"). *Id.* at ¶¶11-12. Jim Visconti ("Mr. Visconti") was assigned to the 2017 claim as the property claim professional. *Id.* at ¶12. On February 22, 2017, Mr. Visconti inspected the Residence together with a representative from Trinity Inspections. *Id.* at ¶14. On February 24, 2017, Mr. Visconti sent plaintiff a letter advising him that the covered damage to the roofing did not exceed his deductible, and that other reported damage to the crawlspace was not covered under his policy. *Id.* at ¶15.

Hurricanes Florence and Dorian made landfall in North Carolina on or around September 14, 2018, and September 16, 2019, respectively. *Id.* at ¶¶21-22. On December 14, 2019, plaintiff filed claim number IGM2624 ("First 2019 claim") with defendant alleging that his roof was actively leaking in multiple areas. *Id.* at ¶24-25. Defendant assigned the First 2019 claim to Erin Karaffa ("Ms. Karaffa"). *Id.* Ms. Karaffa inspected the Residence on December 20, 2019. *Id.* at ¶30. Plaintiff alleges that on December 20, 2019, defendant "approved a full roof replacement based on hail damage." *Id.* at ¶33. On January 21, 2020, Blake Mayberry, a forensic engineer

2

with Vertex Engineering, hired by defendant, inspected plaintiff's Residence. *Id.* at ¶¶38-41.

On March 10, 2020, plaintiff received documentation from defendant confirming that defendant would replace his roof, and on March 11, 2020, plaintiff received the associated check. *Id.* at ¶¶57-58. On March 11, 2020, defendant also advised plaintiff that it had, of its own initiative, opened a second claim, claim number IGM8299, with a reported date of loss of December 14, 2019 ("Second 2019 claim"). Plaintiff alleges that he had not heard from defendant regarding the Second 2019 claim from the date it was opened until the date he filed the instant complaint. *Id.* at ¶60. When plaintiff tried to renew his policy with defendant in 2021, he was denied coverage due to his open claims. *Id.* at ¶61.

On August 10, 2021, Greenhill Restoration, LLC ("Greenhill"), a third-party estimator service, inspected the Residence to evaluate the cost to return the Residence to its pre-Hurricane Florence condition. *Id.* at ¶62; [DE-99] at 1. Plaintiff alleges that "Greenhill . . . estimates that the Residence is a total loss and that more than $600,000 is needed to place plaintiff in the position he was prior to Hurricane Florence." [DE-57] at ¶62.

## II. Procedural background

On November 12, 2021, defendant filed a notice of removal of this case from Sampson County Superior Court. [DE-1]. On November 19, 2021, defendant filed an updated notice of removal. [DE-12]. On July 20, 2022, defendant filed a joint Rule 26(f) Report. [DE-40]. On July 28, 2022, United States District Judge Louise W. Flanagan filed a case management order (the "Case Management Order"), which specified June 19, 2023, as the end of discovery. [DE-41] at 1. The Case Management Order specifically notes that:

> Although plaintiff requests that each party be able to serve 50 interrogatories, he provides no reason to exceed the presumptive 25 provided for by Rule 33(a)(1) of the Federal Rules of Civil Procedure. Further, the court does not endorse a

3

limitation greater than 25 for requests for production [("RPDs")] under Rule 34, where the parties differ in the number of [RPDs] suggested.

*Id.* at 1, n.1.

The Case Management Order also provides that "[b]efore filing [any motions to compel or for protective order,] the court requires notice of such disputed discovery issue(s) for its consideration in setting a telephonic discovery conference." *Id.* at 6. The parties subsequently requested [DE-43; -48, -60] and the court granted [DE-44; -50; -61] multiple motions to extend the discovery deadline.

On May 20, 2024, defendant filed the instant motion to compel [DE-68], requesting, *inter alia*, reasonable expenses, including attorney's fees. *See id.* at 1. In support of its motion, defendant filed a memorandum [DE-69] and exhibits [DE-68-1 to -11; DE-69-1]. In response to defendant's motion to compel, on May 28, 2024, plaintiff filed the instant motion for protective order and expenses [DE-71]. Plaintiff filed a memorandum [DE-72] and exhibits [DE-72-1 to 72-3] in support of his motion.[1] Notably, the parties failed to request a telephonic discovery conference as required by the Case Management Order ([DE-41] at 6) prior to filing the above motions.

On May 27, 2024, plaintiff filed a motion to extend the discovery deadline [DE-70], which defendant opposed [DE-79]. The motion was resolved by the court's entry of the Joint Scheduling Order [DE-88], which provided as follows:

> 1.  On July 22, 2024, [p]laintiff shall provide a supplemental production of materials that are responsive to [d]efendant's discovery requests that are stored in [p]laintiffs Dropbox account. To ensure that relevant documents are produced, [p]laintiff will certify that he had reviewed his Dropbox account and has either produced all relevant documents/recordings or provided a privilege log for any relevant documents/recordings withheld as

---

[1] On June 3, 2024, a third-party, Lewis E. O'Leary, filed a motion to quash and motion for protective order [DE-77], which the undersigned denied as moot by separate order. [DE-102].

it relates to his claims, his asserted damages, and [d]efendant's asserted defenses.

2. On July 22, 2024, [p]laintiff shall submit a brief in support of [p]laintiff's position regarding his claim for privilege regarding the deposition of Lewis O'Leary [("Mr. O'Leary")].

3. On July 22, 2024, [d]efendant shall submit a brief in support of [d]efendant's position regarding the Greenhill Restoration recorded phone call.

4. On August 5, 2024, [d]efendant shall submit a brief in opposition to [p]laintiffs position regarding [Mr.] O'Leary.

5. On August 5, 2024, Plaintiff shall submit a brief in opposition to [d]efendant's position regarding the Greenhill Restoration recording.

6. All briefs regarding the deposition of [Mr.] O'Leary and the Greenhill Restoration recording will comply with the local rules for discovery motions. No reply briefs will be permitted.

*Id.* at 1-2.

On July 18, 2024, Judge Flanagan issued a text order in response to a July 17, 2024 notice from plaintiff's counsel "of a dispute between the parties regarding plaintiff's asserted [RPDs] in excess of those permitted by" the Case Management Order. *See* July 18, 2024 Text Order. The text order provides, in relevant part, as follows:

Having reviewed correspondence between the parties, defendant's original and supplemental discovery responses, and the court's case management order, and having held previously a discovery dispute resolution conference with the parties on a separate issue, the court determines that informal conference by telephone is unlikely to aid in resolution of the disputed issues. Accordingly, in this instance, the court dispenses with the requirement, set forth in the court's case management order of convening such a conference with the court. If plaintiff wishes to proceed with advancing issues complained of in discovery, he may file a motion to compel in accordance with the following schedule, to supplement the schedule already set forth by the court in its July 2, 2024, order DE 88: Plaintiff may file a motion to compel on this issue and supporting memorandum on or before July 25, 2024, and defendant shall file a brief in opposition on or before August 5, 2024.

July 18, 2024 Text Order.

5

On July 22, 2024, defendant filed a memorandum [DE-91] and exhibits [DE-91-1 to -4] in support of defendant's motion to compel [DE-68]. On the same day, plaintiff filed a memorandum [DE-94] and exhibits [DE-94-1 to -7] in support of its motion for protective order [DE-71]. On August 5, 2024, defendant filed a memorandum in opposition to plaintiff's motion for protective order. [DE-97]. On August 5, 2024, plaintiff filed a response [DE-99] to defendant's memorandum [DE-91] in support of its motion for protective order [DE-71].

On July 29, 2024, plaintiff filed a motion to compel. [DE-95]. On July 25, 2024, plaintiff had filed a memorandum [DE-94] and exhibits [DE-94-1 to -7] in support of plaintiff's motion to compel [DE-95].[2] On August 5, 2024, defendant filed a response in opposition [DE-98] to plaintiff's motion to compel.

On November 12, 2024, the undersigned held a telephonic hearing (the "November 12 hearing") addressing the pending motions, including Docket Entries 68, 71, and 95.[3] Counsel for plaintiff and defendant were each heard regarding the pending motions. [DE-101]. Counsel for the parties argued their respective positions on the remaining motions as discussed in greater detail below. The court directed the parties to continue to meet and confer regarding specific discovery items, and scheduled a follow-up telephonic hearing for November 20, 2024.

On November 20, 2024, the undersigned held an additional telephonic status conference ("November 20 hearing"), where counsel for plaintiff and defendant were again each heard regarding the pending motions. [DE-103]. The court directed the parties to continue to meet and confer regarding specific discovery items, and scheduled a follow-up telephonic hearing for

---

[2] Plaintiff had filed a motion to compel on July 25, 2024 [DE-93] that was deficient in not selecting all of the motion events requested in the document. *See* July 29, 2024 notice of deficiency docket entry. Plaintiff refiled the motion to compel on July 29, 2025 [DE-95], as directed by the court's July 29, 2024 notice of deficiency docket entry.
[3] The court also considered Docket Entries 73 and 77, which it subsequently denied as moot. *See* [DE-102].

November 25, 2024. *Id.*

On November 25, 2024, the undersigned held an additional telephonic status conference ("November 25 hearing"), where counsel for plaintiff and defendant were again each heard regarding their meet and confer efforts. [DE-104]. Based upon the updates and positions of counsel, the court concluded that no further hearings were likely to assist in resolving the motions below.

The relevant results of the hearings and related meet and confer efforts will be discussed in the context of the relevant motion below.

## APPLICABLE LEGAL PRINCIPLES

The Federal Rules of Civil Procedure enable parties to obtain information by serving requests for discovery upon each other, including interrogatories and RPDs. *See generally* Fed. R. Civ. P. 26-37. Rule 26 provides for a broad scope of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

The rules of discovery, including Rule 26, are to be given broad and liberal construction. *Herbert v. Lando*, 441 U.S. 153, 177 (1979); *Nemecek v. Bd. of Governors*, No. 2:98-CV-62-BO, 2000 WL 33672978, at *4 (E.D.N.C. Sept. 27, 2000). While Rule 26 does not define what is deemed relevant for purposes of the rule, relevance has been "broadly construed to encompass 'any possibility that the information sought may be relevant to the claim or defense of any party.'" *Equal Emp. Opportunity Comm'n v. Sheffield Fin. LLC*, No. 1:06-CV-889, 2007 WL 1726560, at

7

*3 (M.D.N.C. June 13, 2007) (quoting *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 473 (N.D. Tex.)); *see also Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R. 238, 240 (E.D.N.C. 2010) ("During discovery, relevance is broadly construed 'to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'") (quoting *Oppenheimer Fund., Inc., v. Sanders*, 437 U.S. 340, 351 (1978)). The district court has broad discretion in determining relevance for discovery purposes. *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 489 (4th Cir. 1992). Rule 37 allows for the filing of a motion to compel where a party fails to respond to written discovery requests. Fed. R. Civ. P. 37(a)(3)(B). In addition, Rule 37 requires that the moving party be awarded expenses when a motion to compel discovery is granted except when the movant filed the motion without attempting in good faith beforehand to obtain the discovery without court intervention, the opposing party's opposition to the discovery was substantially justified, or other circumstances would make an award of expenses unjust. Fed. R. Civ. P. 37(a)(5)(A).

The court is also authorized to impose appropriate limitations on discovery. Rule 26 provides that the "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Such orders may prescribe, among other measures, "forbidding the disclosure or discovery" or "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." *Id.* (c)(1)(A), (c)(1)(D). A party moving for a protective order has the burden of making a particularized showing of why discovery should be denied, and conclusory or generalized statements in the motion fail to meet this burden. *Smith v. United Salt Co.*, No. 1:08CV00053, 2009 WL 2929343, at *5 (W.D. Va. 9 Sept. 2009).

8

## ANALYSIS

### I. DEFENDANT'S MOTION TO COMPEL [DE-68] AND PLAINTIFF'S MOTION FOR PROTECTIVE ORDER [DE-71][4]

Generally, defendant's motion to compel seeks certain documents that it claims are responsive to its discovery requests, but have not been produced and certain audio recordings made by plaintiff of his conversations with various parties. *See generally* [DE-68].[5]  Plaintiff seeks a protective order for "communication had at [plaintiff's] attorney's direction, written communications containing attorney work product, or communications had in anticipation of litigation be protected from production of documents."[6]  [DE-71] at 1.

At the November 12 hearing, the parties provided an update to the court regarding the issues resolved between the parties in the  respective motions, and what issues remained in contention.  Defendant's counsel provided at the hearing that its motion to compel [DE-68] covered the following categories: (1) documents in plaintiff's Dropbox account that were responsive to defendant's discovery requests but had not been produced ("the Dropbox documents"); (2) audio recordings made by plaintiff of conversations with third-parties: (i) Vertex Engineering, (ii) the North Carolina Department of Insurance (collectively, the "Vertex-NCDOI

---

[4] As there is significant overlap between the topics discussed in defendant's motion to compel [DE-68] and plaintiff's motion for protective order [DE-71], the court will consider and discuss, as relevant, arguments raised in one motion as they relate to other.

[5] The initial memoranda [DE-69, -72] in support of defendant's motion to compel [DE-68] and plaintiff's protective order [DE-71], respectively, were filed prior to complying with the Case Management Order [DE-41] requirement to advise the court of the discovery issues.  *See* [DE-72; -73].  Moreover, numerous issues raised in these initial memoranda were mooted in light of subsequent hearings before Judge Flanagan and the undersigned, as well the memoranda [DE-91, -92] and responses in opposition [DE-97, -99] that were filed after the court's July 18, 2024 text order.  However, to the extent still relevant, the undersigned has considered arguments raised in the initial memoranda [DE-69, -72] for purposes of its analysis herein.

[6] While the only specific recording for which plaintiff requested protection from discovery in his motion for protective order was the Greenhill Recording (*see* [DE-71] at 1; [DE-71-1]), plaintiff's memorandum in support of his motion for protective order additionally requests that the court enter an Order prohibiting or limiting the scope of a deposition of Mr. O'Leary.  [DE-92] at 10.

Recordings"), and (iii) Greenhill Restoration (the "Greenhill Recording"), respectively.[7] Defendant represented that the Vertex-NCDOI Recordings had been produced, but that the Dropbox documents and the Greenhill Recording remained outstanding.

Plaintiff contended that the issue relating to the Dropbox documents had been resolved on the day before the November 12 hearing because plaintiff had complied with the directive given by Judge Flanagan (*see* Joint Scheduling Order [DE-88]) with respect to his Dropbox account. The parties were in agreement that pursuant to Judge Flanagan's directive (*see* [DE-88] at 1-2), plaintiff had provided an affidavit specifying that he had searched his Dropbox account and that no relevant documents remained outstanding. However, defendant contended that in light of documents it had received through third-party subpoenas, which plaintiff had not provided, it had reason to doubt the accuracy of plaintiff's affidavit. Plaintiff's position was that in light of the production of the affidavit, the only outstanding issues related to the Greenhill Recording and the privilege of Mr. O'Leary. The undersigned directed the parties to meet and confer on various topics, including whether they could agree to a limited number of search terms to be used by a third-party to search plaintiff's Dropbox account.

At the November 20 hearing, plaintiff advised the court that no issues had been resolved with respect to its motion for protective order. Specifically, plaintiff sought to assert privilege (i) with at least a portion of the Greenhill Recording and (ii) with respect to at least certain periods of Mr. O'Leary's interactions with plaintiff. Defendant additionally sought a joint-subpoena to Dropbox to confirm whether any documents had been deleted from plaintiff's Dropbox account since the anticipated date of litigation of the instant matter, March 11, 2020, including the name,

---

[7] At the direction of Judge Flanagan, a copy of the Greenhill Recording was provided to the court for *in-camera* review.

type and file size and any meta data related to each such document. *See* [DE-92] at 6. Defendant represented that it had historically experienced difficulties in obtaining documents through subpoena from large third-party entities.

As the parties indicated that there may be additional scope for compromise on these issues, the undersigned ordered the parties to engage in further meet and confer efforts. However, at the November 25 hearing, the parties reported that they had been unable to come to any agreement regarding any search terms or joint-subpoena.

Accordingly, the three remaining issues before the court with respect to defendant's motion to compel [DE-68] and plaintiff's motion for protective order [DE-71] are: (i) plaintiff's Dropbox documents; (ii) the Greenhill Recording; and (iii) the deposition of Mr. O'Leary. Each is discussed below.

## A.    Dropbox documents

While defendant's motion to compel alleges that "[p]laintiff has failed to produce relevant documents stored on his Dropbox account" ([DE-68] at 3), defendant's memorandum does not otherwise specify (i) what these suspected documents are or (ii) what evidence suggests that documents are being withheld that are stored in plaintiff's Dropbox account. At the telephonic hearings before the undersigned, defendant repeatedly alleged that documents it had received from third-party subpoenas, including from the Wounded Warrior Project, suggested that plaintiff had not produced all responsive documents from his Dropbox. Defendant also cited the late disclosure of documents from American Home Shield ("AHS documents") between the November 20 hearing and the November 25 hearing as evidence that plaintiff's Dropbox was likely to contain responsive

11

documents.[8]

       While defendant generally alleges that documents produced through third-party subpoenas suggest that responsive documents remain in plaintiff's Dropbox account, defendant has not shown why such documents are likely to be in plaintiff's Dropbox account. Moreover, plaintiff's counsel represented at the November 25 hearing that the AHS documents, which had recently been produced to defendant, originated in plaintiff's email account, not his Dropbox account.

       The parties agree that Judge Flanagan directed plaintiff to provide an affidavit confirming that he had searched his Dropbox account and that no further responsive documents remained. The undersigned finds that defendant has not provided any evidence that would require the court to reopen this issue.

       Defendant discussed at the telephonic hearings before the undersigned its intention to subpoena Dropbox to determine whether any documents had been deleted from plaintiff's Dropbox account since the date of anticipated litigation. Plaintiff represented at the November 25 hearing that it opposed such a subpoena. Such information falls outside the scope of Judge Flanagan's directive for plaintiff to confirm that no relevant documents remained in his Dropbox account. *See* [DE-88] at 1-2 ("*Plaintiff* shall provide a supplemental production of materials that are responsive to [d]efendant's discovery requests that are *stored in* [p]laintiff's Dropbox account." (emphasis added)). The undersigned can see no prejudice to plaintiff by any such subpoena, particularly in light of plaintiff's counsel's representations that such a subpoena would not produce any responsive documents. Defendant may reference the instant order in any such subpoena.

---

[8] At the hearings before the undersigned, plaintiff's counsel explained that plaintiff did not consider the AHS documents to be relevant to the instant dispute but had belatedly produced them when plaintiff, in an effort to demonstrate good faith, manually reviewed his email to determine if he possessed of any unlabeled documents that defendant was seeking, which had not been captured by the use of previous search terms.

12

## B.    Greenhill Recording

Plaintiff alleges that he met with consultants and contractors, such as Greenhill, to obtain estimates in anticipation of litigation.[9]  [DE-99] at 2.  In 2021, plaintiff solicited an estimate from Greenhill to tear down and rebuild the Residence.  [DE-91] at 2.  A contractor, Pat's Projects, assisted Greenhill with creating sections of estimates related to the exterior of the Residence.  *Id*. Plaintiff also requested an estimate for the cost to repair the Residence to its pre-damaged state. *Id*.  In his Amended Complaint, plaintiff represents that "[o]n August 10, 2021, Greenhill Restoration inspected the Residence . . . [and estimated] that the Residence is a total loss and that more than $600,000 is needed to place [plaintiff] in the position he was prior to Hurricane Florence."  [DE-57] at 16, ¶62.

On September 9, 2021, the day that plaintiff commenced the instant action against defendant in state court, plaintiff recorded a call (the "Greenhill Call") between himself, Rhamy Emara ("Mr. Emara") of Greenhill, and Patrick Fluhr ("Mr. Fluhr") of Pat's Projects, *i.e.*, the "Greenhill Recording" at issue.  *See* [DE-99] at 1; *see also* [DE-68] at 3; [DE-68-6] at 2; [DE-91] at 1.  Defendant alleges that while a final draft of the repair estimate was never completed, plaintiff received a preliminary draft.  [DE-91] at 2.

On March 18, 2022, Mr. Emara sent an email to plaintiff which ended Greenhill's business relationship with plaintiff and provided in relevant part:

> You [(plaintiff)] . . . asked for a conference call where you expressed your dismay that the repair estimate was not higher than the rebuild estimate because it does not meet your objective of proving a constructive total loss with regard to your active lawsuit against your insurer. Please be advised that Greenhill Restoration cannot and will not be involved in modifying estimates for these purposes and your

---

[9] Defendant contends that Greenhill provided its estimates to plaintiff based on the understanding that plaintiff would hire Greenhill as a general contractor, and not based on any understanding that Greenhill was creating estimates for purposes of the instant litigation.  [DE-91] at 4.  The undersigned does not find any evidence from its *in-camera* review of the Greenhill Recording to support this understanding.

13

insistence that we do has caused an alarm within our company as we do not desire to partake in anything that comes remotely close to insurance fraud.

[DE-91-1] at 9.

At plaintiff's deposition on May 7, 2024, he testified that he was in possession of the "Greenhill Recording." [DE-68] at 3; [DE-91] at 1; *see also* [DE-99] at 2 (plaintiff contending that his communications with Greenhill were not made relevant until plaintiff's May 7, 2024 deposition). Defendant contends that it learned of the Greenhill Recording for the first time at plaintiff's May 7, 2024 deposition. [DE-91] at 4.

Defendant claims that the Greenhill Recording would show that after receiving the preliminary draft of the repair estimate from Greenhill, plaintiff expressed his dissatisfaction to Greenhill and Pat's Projects that the preliminary draft of the repair estimate was lower than the tear down and rebuild estimate and did not meet his objective of proving a constructive total loss. [DE-91] at 2-3. Plaintiff argues that portions of the Greenhill Recording, at a minimum, are privileged because he "made [the Greenhill Recording] after his lawsuit was filed, and additional portions of the conversation include communications made at the direction of [p]laintiff's attorneys and to aid [p]laintiff's attorneys in the underlying litigation." [DE-72] at 8. Plaintiff also contends that "those portions of the communications that contain the attorneys' legal theories would fall under attorney work product and anticipation of litigation." *Id.*

Mr. Emara, as a corporate representative for Greenhill, testified that during the Greenhill Call, plaintiff was telling him "to write [Greenhill's] estimate . . . for more" and "almost . . . reprimanded" him for writing a repair estimate that was not more than the cost to tear down and rebuild. Greenhill Deposition [DE-91-3] 60:12-62:21 ("I almost got reprimanded for writing an estimate that how could you -- how could -- how could I think that the repair wouldn't be more

than the remove and replace.").  However, Mr. Emara also clarified that he did not believe that plaintiff "was asking [him] to engage in insurance fraud" or otherwise asking him to "manipulate anything," but rather he thought that plaintiff "was just upset because maybe in his mind, he thought that it would cost more."  Greenhill Deposition [DE-91-3] 78:2-78:11.

Unwilling to provide defendant with the entire recording, plaintiff notes his willingness to produce the Greenhill Recording if defendant would agree that "(1) any reference to his attorneys' mental theories or impressions would be redacted and (2) any production would not waive or pierce [p]laintiff's privileges."  [DE-99] at 4.

At a telephonic hearing before the court on June 12, 2024, the court directed plaintiff to provide a copy of the audio recording for *in-camera* review by the court.  The court also directed the parties to provide briefs on their respective positions on whether privilege applies to the Greenhill Recording.  *See* [DE-88].  Defendant briefed this question in its memorandum in support of its motion to compel [DE-91], while plaintiff briefed this issue in his response in opposition to defendant's motion to compel [DE-99].  At the November 25 hearing, counsel for plaintiff stated that they could provide an unofficial transcript of the Greenhill Recording, indicating what portions of the recording plaintiff sought to redact.  The undersigned requested that a copy of the unofficial transcript with proposed redactions, as referenced by counsel for plaintiff, be provided to the court for consideration in its review of the previously provided audio recording.  Plaintiff timely provided the redacted unofficial transcript to the court.

### 1.  Applicable legal principles for work-product doctrine

The work product doctrine provides that "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" are generally not discoverable.  Fed. R. Civ. P. 26(b)(3)(A).  "The work product doctrine shields from discovery

any documents or tangible things prepared in anticipation of litigation and materials reflecting the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party." *Burroughs Wellcome Co. v. Barr Lab'ys, Inc.*, 143 F.R.D. 611, 617 (E.D.N.C. 1992) (citing *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); Fed.R.Civ.P. 26(b)(3)). "[T]he party invoking the [work-product] doctrine bears the burden of showing that it applies." *Sharpe v. Best*, No. 4:21-CV-00185-BO, 2024 WL 2263376, at *3 (E.D.N.C. May 17, 2024) (citing *Sandberg v. Va. Bankshares, Inc.*, 979 F.2d 332, 355 (4th Cir. 1992)).

The relevant exceptions to this general rule depend upon whether the information sought is opinion work product or fact work product. *See In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 250 (4th Cir. 2005); *see also Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1217 (4th Cir. 1976). Opinion work product consists of a counsel's or representative's "mental impressions, opinions, and legal theories." *Id.* at 1223. "Opinion work product doctrine material also includes materials reflecting an attorney's legal strategy, intended lines of proof, and evaluation of the strengths and weaknesses of his case." *Republican Party of N. Carolina v. Martin*, 136 F.R.D. 421, 429 (E.D.N.C. 1991) (citing *Sporck v. Peil*, 759 F.2d 312 (3d Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985)). "Non-opinion or fact work-product 'consists of documents prepared . . . that do not contain the attorney's mental impressions.'" *Carolina Power & Light Co. v. 3M Co.*, 278 F.R.D. 156, 159 (E.D.N.C. 2011) (quoting *In re Grand Jury Proc.*, 401 F.3d 247, 250 (4th Cir.2005)).

"Fact work product, which consists of documents prepared [in anticipation of litigation] that do not contain the [party's or representative's] mental impressions, can be discovered upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship." *In re Grand Jury Proc.*, 401 F.3d at 250

16

(internal quotation and quotation marks omitted).

"[O]pinion work product 'enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances.'" *In re Allen*, 106 F.3d 582, 607 (4th Cir. 1997). "One such privilege-eroding circumstance[, known as the crime-fraud exception,] is when the protected material's purpose is to further a crime or fraud." *In re Grand Jury 2021 Subpoenas*, 87 F.4th 229, 254 (4th Cir. 2023). "[W]hile the attorney-client privilege may be vitiated without showing that the attorney knew of the fraud or crime, those seeking to overcome the opinion work product privilege must make a prima facie showing that the 'attorney in question was aware of or a knowing participant in the criminal [or fraudulent] conduct.'" *In re Grand Jury Proc.*, 401 F.3d at 252.

### 2. Analysis of work product doctrine

#### a. Anticipation of litigation

Defendant argues that the recording does not fall under the protection of the work-product doctrine because it was not created in anticipation of litigation or for trial. [DE-91] at 6. Defendant contends that plaintiff's deposition testimony shows that he did not make the recording in anticipation of litigation. [DE-91] at 7. Defendant notes that plaintiff testified that he recorded the conversation because "something in [his] gut that said [he] need[ed] to [make the recording]," but did not mention anticipated litigation as the reason. [DE-91] at 7 (citing [DE-68] at 267:17).

The court notes that plaintiff had this "gut feeling" on the day his attorney filed the instant suit. Accordingly, the undersigned finds that the context reasonably demonstrates that this "gut feeling" related to the instant litigation and was in anticipation thereof. *Bahrami v. Price*, No. 1:11-CV-4483-SCJ-AJB, 2013 WL 3800093, at *6 (N.D. Ga. July 19, 2013) ("Indeed, the Court is hard-pressed to think of any other reason Plaintiff in the instant case would have made the effort

17

to record the witness interviews [besides the anticipation of litigation]").  The court finds that the Greenhill Recording was made in anticipation of litigation.

### b.    *Plaintiff's work product*

Defendant also notes that plaintiff could not have made the recording at the direction of his attorneys as plaintiff's attorneys allegedly only became aware of the recording at plaintiff's deposition on May 7, 2024.  [DE-91] at 7-8.  The language of the Federal Rules does not limit the work product doctrine to materials created by attorneys.  *See Otto v. Box U.S.A. Group, Inc.*, 177 F.R.D. 698, 699 (N.D. Ga. 1997) ("[A] plaintiff who creates work-product material before hiring an attorney is still permitted to take advantage of the work-product doctrine.").  Accordingly, the court finds that the Greenhill Recording constitutes work product under Federal Rule of Civil Procedure 26(b)(3).

### c.    *Substantial need*

Defendant argues that if the Greenhill Recording is found to be work-product, defendant has substantial need for the Greenhill Recording and is unable to obtain the substantial equivalent by other means.  [DE-91] at 10.  Defendant argues that the substantial need arises from the fact that the "Greenhill's testimony has called into question the authenticity of the $923,541.81 repair estimate that [p]laintiff currently relies on as his only calculation of alleged damages."  [DE-91] at 11.

The authenticity of estimates underlying calculation of alleged damages is an issue in this case.  The court agrees that deposition testimony from Mr. Emara may draw into question the authenticity of certain repair estimates and that portions of the Greenhill Recording provide context for the development of the relevant estimates.  *See* Greenhill Deposition [DE-91-3] 56:23-57:11 (Defendant's counsel: "Do you recall ever providing Mr. LaBudde with a repair estimate for over

$900,000?"; Mr. Emara: "No"; Defendant's counsel: "Did you ever provide Mr. LaBudde with an estimate where the repair cost was more expensive than the rebuild cost?"; Mr. Emara: "No."). Accordingly, the court finds that defendant's substantial need for the information in the Greenhill Recording overcomes the protection of fact work product.

> d. *Opinion work product*

Plaintiff contends that even in the presence of substantial need, "portions of the Greenhill recording containing legal theories or impressions should be redacted." [DE-99] at 6. The court has conducted an *in-camera* review of the Greenhill Recording and the redacted unofficial transcript of the Greenhill Recording, which plaintiff provided to the court. Based on this review, the court does not find that any portions of the Greenhill Recording contain "legal theories or impressions" or otherwise constitute opinion work product.

The redacted portions of the draft transcript that plaintiff provided to the court for *in-camera* review reveal that the relevant portions of the Greenhill Recording relate to the "goal" or "plan" for the repair estimate of the Residence to be higher than the replacement estimate demonstrating that the Residence was a "constructive total loss."

As an initial matter, while work-product may originate with a non-attorney representative for the reasons discussed above, a cognizable "legal theory" or "legal strategy" cannot come from a non-attorney without running afoul of the prohibition on the unauthorized practice of law. *See* N.C.G.S. § 84-4 ("Except as otherwise permitted by law, it shall be unlawful for any person or association of persons, except active members of the Bar of the State of North Carolina admitted and licensed to practice as attorneys-at-law . . . to hold out himself, or themselves, as competent or qualified to give legal advice or counsel"). The Greenhill Recording indicates that the goal of demonstrating a constructive loss may have originated with Mr. O'Leary. Additionally, plaintiff's

Amended Complaint represents that Greenhill "estimate[d] that the Residence is a total loss." [DE-57] at 16. While plaintiff or his attorney were certainly entitled to explore whether any repair estimate demonstrated a constructive total loss, the existence of any such constructive total loss would rest on repair and rebuild estimates provided by companies like Greenhill, and not on legal principles. As evidenced in the Greenhill Recording, Greenhill was guided in developing these estimates based on the costs of repairs and replacements rather than any "legal strategy."

Similarly, the fact that it would be financially illogical to repair a property for more money than it would cost to rebuild the same property is a financial reality rather than a "legal theory." Likewise, the merits of a constructive total loss are so self-evident that they cannot be considered a non-legal opinion or mental impression of a non-legal representative in this case.[10] To the extent that "constructive total loss" represented a "goal," it is no more of a goal than maximizing the damages legally available may often be the goal of a plaintiff and plaintiff's counsel that have filed a suit for damages. Accordingly, the court does not find that the Greenhill Recording includes opinion work product.

Defendant contends that even if the recording contained any legal theories, plaintiff waived the privilege with respect to such theories by communicating them to Greenhill and Pat's Projects as third-parties. [DE-91] at 8. The court notes that opinion work product and attorney-client privilege are distinct legal concepts with only the latter being subject to waiver by third-party disclosure. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992) ("The work product immunity, which is frequently referred to as a 'work

---

[10] While defendant voices a "substantial need to review the [Greenhill Recording] for itself to determine whether [p]laintiff has requested others to engage in insurance fraud," ([DE-91] at 11), there is no allegation that plaintiff did engage in insurance fraud, and defendant does not appear to otherwise seek to invoke this exception (*see generally* [DE-91] at 11).

20

product privilege,' is not to be confused with the attorney-client privilege which arises from different circumstances and is subject to different protections and waivers.") (citing *United States v. Pollard* (*In re Martin Marietta Corp.*), 856 F.2d 619 (4th Cir.1988), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989)). While work product privilege can be waived, *United States v. Nobles*, 422 U.S. 225, 239, 95 S. Ct. 2160, 2170, 45 L. Ed. 2d 141 (1975), "[u]nlike the attorney-client privilege, however, the work-product privilege is not waived by mere disclosure but instead by making 'testimonial use' of the protected material." *Wells v. Liddy*, 37 F. App'x 53, 65 (4th Cir. 2002) (quoting *Nobles*, 422 U.S. at 240 n. 14, 95 S.Ct. 2160); *see also FEC v. Christian Coalition*, 178 F.R.D. 61, 76 (E.D.Va.1998) ("[W]hile the mere showing of a voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work product privilege."). The court considers waiver of the attorney-work product below.

### 3. Waiver of attorney-client privilege

#### a. *Legal principles governing attorney-client privilege*

"Attorney-client privilege protects confidential communications between the client and the attorney." *In re Grand Jury Proc.*, 401 F.3d at 250. While the work product doctrine is a procedural dictate governed by federal law, *see* Fed. R. Civ. P. 26(b)(3)(A), attorney-client privilege is governed by state law in diversity cases. *See* Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."); *see also Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 286 (4th Cir. 2000) ("Although in a diversity action the availability of an evidentiary privilege is governed by the law of the forum state." (citing Fed. R. Evid. 501)); *U.S. Tobacco Coop., Inc. v. Certain Underwriters at Lloyd's*, No. 5:19-CV-00430-BO, 2021 WL 1341360, at *10 (E.D.N.C. Apr. 9, 2021) ("As state law

21

governs the claims here, state law also controls the court's attorney-client privilege analysis." (citing Fed. R. Evid. 501)).

A federal court sitting in diversity must predict how the state supreme court of the applicable state law would rule on the relevant issue. *See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.*, 433 F.3d 365, 369 (4th Cir. 2005); *Warren v. Smithfield Packing Co.*, No. 5:14-CV-71-D, 2014 WL 1691513, at *2 (E.D.N.C. Apr. 29, 2014) ("[S]itting in diversity, this court must predict how the Supreme Court of North Carolina would rule."). However, in undertaking this exercise, "a federal court 'should not create or expand [a] State's public policy.'" *Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 506 F.3d 304, 314 (4th Cir. 2007) (alteration in original) (quoting *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir.1995)). Similarly, "[a]bsent a strong countervailing federal interest, the federal court . . . should not elbow its way into this controversy to render what may be an uncertain and ephemeral interpretation of state law." *Id.* (alterations in original) (quoting *Mitcheson v. Harris*, 955 F.2d 235, 238 (4th Cir.1992)).

The North Carolina Supreme Court developed a five-part test (the "*McIntosh* factors") to determine whether the attorney-client privilege applies to a particular communication:

> (1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although litigation need not be contemplated and (5) the client has not waived the privilege.

*In re Miller*, 357 N.C. 316, 335, 584 S.E.2d 772, 786 (2003) (quoting *State v. McIntosh*, 336 N.C. 517, 523, 444 S.E.2d 438, 442 (1994)).

"If any one of these five elements is not present in any portion of an attorney-client

communication, that portion of the communication is not privileged." *In re Miller*, 357 N.C. 316, 335, 584 S.E.2d 772, 786 (2003). "The burden is always on the party asserting the privilege to demonstrate each of its essential elements." *In re Miller*, 357 N.C. 316, 336, 584 S.E.2d 772, 787 (2003) (citing 1 Scott N. Stone & Robert K. Taylor, Testimonial Privileges § 1.61, at 1-161 (2d ed.1994)).

"Although an attorney may assert the privilege when necessary to protect the interests of the client, the privilege belongs solely to the client." *In re Miller*, 357 N.C. 316, 338-39, 584 S.E.2d 772, 788 (2003); *see also In re Martin Marietta Corp.*, 856 F.2d 619, 623 (4th Cir. 1988) (finding subject matter waiver as to (i) attorney-client privilege and (ii) non-opinion work-product, but not with respect to opinion work product).

The North Carolina Supreme Court noted that "[c]ommunications do not merit the attorney-client privilege when they are made in the presence of a [third-party]." *Glob. Textile All., Inc. v. TDI Worldwide, LLC*, 375 N.C. 72, 76, 847 S.E.2d 30, 34 (2020) (citing *State v. Murvin*, 304 N.C. 523, 531, 284 S.E.2d 289, 294 (1981)); *Berens v. Berens*, 247 N.C. App. 12, 20, 785 S.E.2d 733, 740 (2016) ("Generally, communications between an attorney and client are not privileged if made in the presence of a third-party because those communications are not confidential and because that person's presence constitutes a waiver."). However, counsel for neither party in this case points to any holdings by the North Carolina Supreme Court or North Carolina Courts of Appeal governing waiver of attorney-client privilege in light of subsequent disclosure to a third-party.

Multiple superior courts in North Carolina, however, have recognized a waiver of attorney-client privilege in light of disclosure to a third-party. *Window World of Baton Rouge, LLC v. Window World, Inc.*, No. 15 CVS 1, 2019 WL 3995941, at *11 (N.C. Super. Aug. 16, 2019), *aff'd*,

23

2021-NCSC-70, ¶ 36, 377 N.C. 551, 857 S.E.2d 850 ("The attorney-client privilege can be waived by either intentional disclosure or inadvertent disclosure. In either case, a finding of waiver depends on the particular circumstances surrounding the disclosure.") (quoting *Blythe v. Bell*, 2012 NCBC LEXIS 44, at *21, 2012 WL 3061862 (N.C. Super. Ct. July 26, 2012)). As one of those opinions was affirmed by the North Carolina Supreme Court, *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2021-NCSC-70, ¶ 1, 377 N.C. 551, 552, 857 S.E.2d 850, the court finds that the North Carolina would likely also adopt such an approach.

> b. *Analysis of attorney-client privilege*

Plaintiff contends that while he "does not believe he waived attorney-client privilege, [p]laintiff's counsel feared that some communications in the [Greenhill Recording] were too close for comfort." [DE-99] at 7. The court's *in-camera* review of the Greenhill Recording reveals that plaintiff conveyed certain confidential communications made by his attorney to Greenhill. As noted above, however, the court does not find these communications included "mental impressions, conclusions, opinions, or legal theories." Fed. R. Civ. Proc. 26(b)(3)(B). The court finds that one or more of these communications appear to satisfy the requirements of the first four *McIntosh* factors. *See* 444 S.E.2d at 442. Plaintiff has not alleged or otherwise demonstrated that Greenhill was an agent of plaintiff or could otherwise receive attorney-client privileged information without loss of the privilege.[11]

The North Carolina Supreme Court and North Carolina Courts of Appeal have not

---

[11] "Agency [under North Carolina law] is defined as 'the relationship that arises from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Berens*, 247 N.C. App. at 21, 785 S.E.2d at 740 (quoting *Green v. Freeman*, 233 N.C.App. 109, 112, 756 S.E.2d 368, 372 (2014)). "There are two essential ingredients in the principal-agent relationship: (1) Authority, either express or implied, of the agent to act for the principal, and (2) the principal's control over the agent." *Phelps–Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C.App. 427, 435, 617 S.E.2d 664, 669 (2005) (citation omitted) (internal quotation marks omitted). Plaintiff has not alleged facts sufficient to support these factors here.

24

determined whether waiver of attorney-client privilege by inadvertent disclosure creates a subject matter waiver, *i.e.*, "also end[ing] the privilege as to any related but not disclosed communications," *Technetics Grp. Daytona, Inc. v. N2 Biomedical, LLC*, No. 17 CVS 22738, 2018 WL 5892737, at *6 (N.C. Super. Nov. 8, 2018), or a more limited waiver. Multiple North Carolina trial courts have rejected a strict subject matter waiver in exchange for "a balanced approach" employing certain "fairness considerations." *Id.*; *see also Window World of Baton Rouge, LLC*, 2019 WL 3995941, at *14. Under this approach, "when a party reveals part of a privileged communication to gain an advantage in litigation, the party waives the attorney-client privilege as to all other communications relating to the same subject matter." *Window World of Baton Rouge*, *LLC*, 2019 WL 3995941, at *14 (quoting *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982)). "On the other hand, when the disclosure does not create an unfair advantage, courts typically limit the waiver to the communications actually disclosed." *Window World of Baton Rouge*, *LLC*, 2019 WL 3995941, at *14 (quoting *Technetics Grp. Daytona, Inc.*, 2018 NCBC LEXIS 116, at *18, 2018 WL 5892737). In sum, the balance approach "limit[s] subject matter waiver "to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner." *Technetics Grp. Daytona, Inc. v. N2 Biomedical, LLC*, No. 17 CVS 22738, 2018 WL 5892737, at *7 (N.C. Super. Nov. 8, 2018) (quoting Fed. R. Evid. 502(a) advisory committee's note).

The court finds that in light of a federal court's mandate to "not create or expand [a] State's public policy," *see Time Warner Ent.-Advance/Newhouse P'ship*, 506 F.3d at 314, it should construe any such waiver as narrowly as possible. Additionally, based on the court's *in-camera* review, the undersigned does not find that the disclosure of the information covered by the attorney-client privilege was undertaken in a selective, misleading, and unfair manner. Plaintiff

25

has waived its attorney-client privilege only with respect to the privileged matters discussed during the Greenhill Recording. Accordingly, plaintiff is DIRECTED to produce a full unredacted copy of the Greenhill Recording, but has not waived his attorney-client privilege with respect to the subject matters discussed therein.

## C. Deposition of Mr. O'Leary

Plaintiff contends that Mr. O'Leary is a non-testifying expert retained in anticipation of litigation and pursuant to Rule 26(b)(4)(D) may therefore not be deposed. [DE-92] at 3.

Plaintiff alleges that he first spoke with Mr. O'Leary on December 16, 2019, and signed a formal agreement retaining Mr. O'Leary as a Property Loss Consultant on March 26, 2020. [DE-92] at 2. The scope of Mr. O'Leary's work for plaintiff as a property loss consultant under the March 26, 2020 agreement provides that Mr. O'Leary would provide "technical support to [plaintiff] and or his representatives" and would "[b]e available to serve as an expert and or fact witness, if necessary, in any ensuing proceedings." [DE-92-1] at 1. Plaintiff notes that Mr. O'Leary's work as a consulting expert continued after counsel was retained in October 2020. *Id.* Plaintiff appears to have included Mr. O'Leary's report as an addendum to his initial complaint. *See* [DE-12-24]. Plaintiff identified Mr. O'Leary as an individual with knowledge in his initial disclosures. [DE-82-1]. However, plaintiff notes that he subsequently removed Mr. O'Leary's report from his Amended Complaint and does not intend to call him as a testifying expert. [DE-92] at 8; *cf. also* [DE-57]. Plaintiff contends that exceptional circumstances do not justify the deposition of Mr. O'Leary under Rule 26(b)(4)(D) in this case. [DE-92] at 6.

Even assuming defendant's date of anticipated litigation of March 11, 2020, (*see* [DE-92-9] at 1 (plaintiff noting in an email to Travelers on March 11, 2020, that he would "enforce [his] rights under all the applicable NC Laws")), this occurred before plaintiff's agreement with Mr.

26

O'Leary on March 26, 2020. Generally, the federal rules protect from discovery "facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." Fed. R. Civ. P. 26(b)(4)(D). However, the opinions of non-testifying experts are discoverable upon a showing of "exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." Fed. R. Civ. P. 26(b)(4)(D)(ii).

"The party resisting production bears the burden of demonstrating the information sought is entitled to protection under Fed. R. Civ. P. 26(b)(4)(D), and the party seeking disclosure bears the 'heavy burden' of demonstrating 'exceptional circumstances' to justify discovery of any protected information." *H/S Wilson Outparcels, LLC v. Kroger Ltd. P'ship I*, No. 5:15-CV-591-RJ, 2018 WL 1528187, at *2 (E.D.N.C. Mar. 28, 2018) (quoting *McBeath v. Tucson Tamale Co.*, No. CV-16-00462-TUC-DCB (BPV), 2017 WL 3118779, at *6 (D. Ariz. July 21, 2017)).

Defendant alleges that "over two months after formally retaining [Mr.] O'Leary, [plaintiff] was still not preparing for a lawsuit, nor did he want to file a lawsuit." [DE-97] at 2; *cf.* [DE-96-2]. The court notes the following exchange from plaintiff's deposition on May 7, 2020:

| | |
|---|---|
| Defendant counsel: | "Are you still testifying here today that you did not have intentions of filing a lawsuit [as of] May 22nd, 2020." |
| Plaintiff: | "I mean, that's where it was leading to. But no, me personally, I didn't want to." |
| Defendant counsel: | "So from this email it seems like you had had communications with Steve McLeod about your plans to have a legal case." |
| Plaintiff: | "Well, again, it's not my plans. These are experts advising me that because of this all being ignored, that that's probably where this is going. And so that's not me saying that, that's |

|                    | [Mr. O'Leary from Probuilders]."                                                                                                                                                                                            |
|--------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                    | . . .                                                                                                                                                                                                                        |
| Defendant counsel: | "And when did Mr. O'Leary advise you of [the need to file a legal action against your insurance company?"                                                                                                                     |
| Plaintiff:         | "I don't know exactly when."                                                                                                                                                                                                 |
|                    | . . .                                                                                                                                                                                                                        |
|                    | "I -- I don't know. Again, I didn't -- I didn't want -- I didn't want any of this. I didn't want a lawsuit. But again, I'm even telling Crane on 16 December 2019, all I've been asking Travelers to do is get my house back to a home." |

May 7, 2024 Deposition of plaintiff [96-2] at ¶¶222:2-223:10.

The mere fact that plaintiff did not plan or want to litigate as of March 2020 does not preclude plaintiff from having hired Mr. O'Leary *in anticipation* of litigation. Accordingly, the undersigned is not persuaded by defendant's argument in this regard.

Defendant additionally argues that plaintiff "waived any argument that O'Leary was an expert or consulting expert prior to October 2020" when plaintiff's counsel directed Mr. O'Leary to produce documents in response to subpoenas up to and including October 2020. [DE-97] at 6. Defendant also notes plaintiff's representation that "Mr. O'Leary may have valuable information about the state of the subject property and his work with Mr. LaBudde until he started consulting with our law firm." [DE-97] at 6.

Defendant does not cite any case law to support the premise that a non-testifying consulting expert responding to subpoenas upon direction of its client or its client's law firm categorically waives the non-testifying expert's privilege. The court is not persuaded by the argument here.

Defendant also argues that Mr. O'Leary cannot be recloaked as a consulting non-testifying expert after the production of his report in a public filing. [DE-97] at 7. Plaintiff identified O'Leary as a potential witness who "inspected the subject property on several occasions" and "provided an opinion that the damage to Plaintiff's roof was more likely than not, caused by

28

Hurricane Florence." [DE-97] at 7 (citing [DE 82-1].). Defendant cites *Hunt Valley Baptist Church v. Balt. Cty.*, No. 1:17-cv-00804-ELH, 2018 U.S. Dist. LEXIS 188645 (D. Md. Nov. 5, 2018) in support of the argument that plaintiff's public filing of Mr. O'Leary's report in support of the allegations in his complaint should defeat any attempt to designate him as a consulting expert. [DE-97] at 7.

In that case, the plaintiff attempted to designate a Mr. Wells as a non-testifying consulting expert, despite the fact that he had already testified as an expert witness on the same subject matter before the Baltimore County Administrative Law Judge (the "ALJ") and the Board of Appeals. *Hunt Valley Baptist Church v. Balt. Cty.*, 2018 U.S. Dist. LEXIS 188645, *4. The federal district court in *Hunt Valley Baptist Church* found that "Mr. Wells cannot be afforded the full protections of a consulting expert after having testified during the administrative proceedings[,] . . . which precipitated this action." 2018 U.S. Dist. LEXIS 188645, *5. However, in that case, Mr. Wells' testimony was brought into issue because the plaintiff challenged "the constitutionality of the Board's decision, and its Complaint reference[d] a 'licensed surveyor' who 'testified as [an] expert[]' before the ALJ—now known to be Mr. Wells." *Id.* (second and third alterations in original).

Here, plaintiff's original complaint has been superseded by his amended complaint [DE-57], and defendant has not demonstrated how the report attached to the original complaint is relevant to the current proceedings. Defendant notes that "[p]laintiff presented [Mr. O'Leary's report] to the Court to survive the Rule 12(b)(6) stage of the litigation" and argues that this "is akin to Wells' providing previous testimony." [DE-97] at 8. However, plaintiff has no evidentiary burden at the Rule 12(b)(6) stage because in analyzing a Rule 12(b)(6) motion, a court must accept as true all well-pleaded allegations of the challenged complaint and view those allegations in the

29

light most favorable to the plaintiff. *Venkatraman v. REI Sys.*, Inc., 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *see also Lambeth v. Bd. of Comm'rs*, 407 F.3d 266, 268 (4th Cir. 2005) (noting that the court must accept as true all factual allegations of the complaint). While Judge Flanagan did provide a secondary citation to Mr. O'Leary's report, the primary citation was to plaintiff's complaint and the reference to Mr. O'Leary's report was not dispositive for purposes of her order. *See* Order on motion to dismiss in part [DE-37] at 6 (citing plaintiff's Complaint ¶49, but providing a "*see also*" citation to "Lewis O'Leary & Daniel Smith's Report (DE 12-23) at 13).

Defendant notes the findings of one court in this circuit that "some courts have deemed Rule 26(b)(4)(D)'s protection inapplicable when a litigant 'designate[s] an expert as testifying and then[,] after obtaining an unfavorable opinion, simply reclassif[ies] that expert as non-testifying to the detriment of the opposing side to avoid any negative consequences.'" *Walls v. Ford Motor Co.*, 2021 U.S. Dist. LEXIS 184063, *40 (M.D.N.C. 2021) (quoting *Brigham Young Univ. v. Pfizer, Inc.*, No. 2:12MC143, 2012 U.S. Dist. LEXIS 42051, 2012 WL 1029304, at *4 & n.31 (D. Utah 2012) (unpublished)). However, the same court that noted this minority practice, also noted that "[i]n contrast, under 'the majority rule, . . . a party may re-designate an expert as non-testifying and thereby insulate the expert from deposition by other parties absent a showing of exceptional circumstances under Rule 26(b)(4)(D).'" *Id.* (quoting *Layman v. Junior Players Golf Acad., Inc.*, 314 F.R.D. 379, 383 (D.S.C. 2016)). Moreover, both the court in *Walls* and the court in this circuit cited by the *Walls* court followed the majority rule. *Id.* (citing *Layman*, 314 F.R.D. at 383). Moreover, as defendant correctly notes, "[p]laintiff never specifically designated O'Leary as an expert." [DE-97] at 8. Accordingly, the undersigned is unpersuaded by defendant's argument in this respect.

30

Defendant argues that "by producing [Mr.] O'Leary's report as an exhibit in support of [p]laintiff's Verified Complaint, [p]laintiff completely disregarded the purpose behind Rule 26(b)(4)(D) protections . . . that a party should not be able to exploit for its own use trial preparation work undertaken by another party." [DE-97] at 9 (citing Fed. R. Civ. P. 26 advisory committee's notes 1970 amends, to subdiv. (b)(4)). Defendant claims that plaintiff waived any protections Mr. O'Leary enjoyed by disregarding the rationale behind the protections. However, defendant now contradicts the very rationale it cites by "seek[ing] to exploit for its own use trial preparation work undertaken by another party." [DE-97] at 9. Accordingly, the court is not persuaded by this argument.

Finally, defendant argues that it "has a substantial need to take Mr. O'Leary's deposition as it is impracticable for [defendant] to obtain information through other means." [DE-97] at 9. Defendant contends that plaintiff "produced, and attached to his [c]omplaint, a report allegedly drafted by [Mr.] O'Leary and Smith dated February 16, 2021" ([DE-97] at 9 (citing [DE-12-24])), but that defendant "obtained a different copy of that same report through a third-party subpoena with comments from [p]laintiff dated August 23, 2021" (*id.* citing [DE-87-1]). Defendant cites various discrepancies between these two reports, which has allegedly "raised serious questions about the report's authenticity, the date it was drafted, and the substance of the report itself," which only Mr. O'Leary's deposition could allegedly resolve. [DE-97] at 10.

As Mr. O'Leary is a non-testifying expert and plaintiff no longer cites his report in support of his complaint, defendant has not shown the significance of the authenticity, date or substance of any report, which he may have authored.

Defendant also argues that due to Mr. O'Leary's "involvement only days after [p]laintiff opened his insurance claim, [Mr.] O'Leary is the only person who can testify about [p]laintiff's

potential reliance during his claims, a central element to [p]laintiff's extra-contractual claims." [DE-97] at 10. To the extent that defendant refers to Mr. O'Leary's observations or activities prior to March 26, 2020, the court agrees that deposition of such topics would be relevant and not otherwise protected.

Accordingly, plaintiff's motion for protective order is GRANTED IN PART and DENIED IN PART. Specifically, defendant may depose Mr. O'Leary with respect to events that occurred prior to March 26, 2020, but may not depose Mr. O'Leary with respect to any subsequent events protected by Rule 26(b)(4)(D). Additionally, the court puts the practical restrictions on the logistics of the deposition of Mr. O'Leary, as referenced in the court's prior order [DE-102].

## II.  PLAINTIFF'S MOTION TO COMPEL [DE-95]

Plaintiff filed a motion on July 29, 2024, to compel the production by defendant of "the outstanding discovery as [d]efendant failed to provide the complete file, including, the (i) Human Resources ("HR") File [for both adjusters, Ms. Karaffa and Mr. Visconti], (ii) Eligibility Guidelines on Non-Renewals, (iii) the Quality Assurance Procedures for Non-Renewals, and (iv) audit review procedures for Non-Renewals" (requests (ii), (iii), and (iv) together, the "non-renewal documents"). [DE-95] at 1;[12] [DE-94] at 4. Plaintiff contends that "the parties disagree as to where the Court's Case Management Order [(DE-41) at 1, n.1)] set a 25 maximum limitation on [RPDs]." [DE-95] at 1. Specifically, plaintiff notes that he "read the Court's Footnote ([DE-41] at 1, n.1) to state that, unlike Federal Rule of Civil Procedure 33, which has a limitation on 25 Request for Interrogatories, the Court is not representing, either way, whether Rule 34 has a limitation." [DE-94] at 2, n.1. Plaintiff also appears to argue that when "the parties agreed to

_____

[12] The court will construe plaintiff's motion to compel [DE-95] as incorporating the memorandum in support thereof.

Supplement their Discovery Responses as a result of the Court's October 2023 Order permitting [p]laintiff to proceed with his extra-contractual claims," this implicitly included an agreement to allow more than the 25 original RPDs. [DE-95] at 1 (citing [D.E. 60]).

Plaintiff notes that defendant's supplemental discovery production on January 22, 2024, included items, which were responsive to plaintiff's RPD relating to the underwriting file. [DE-94] at 3. However, plaintiff's counsel alleges that she only realized that the underwriting production was incomplete on May 31, 2024, when defendant's 30(b)(6) designees referenced underwriting documents during its depositions, which plaintiff had not received. [DE-94] at 3.

Plaintiff's motion argues that the non-renewal documents are responsive to the first 25 RPDs, including RPDs 1, 13 and 16,[13] which request, respectively:

> each file that was opened, created, or maintained by Defendant relating in any way to the Policy or the Claim, including the complete name or title of the file, its complete file number or other identifying designation, its present custodian and physical location within Defendant, and its general purpose or business classification. This interrogatory seeks the identification of each "claims file," each "litigation file" and each "underwriting file," under whatever designation or description, and every copy or duplicate thereof which may exist within Defendant.
>
> [RPD 1]
>
> A complete copy of each and every file that was opened, created, or maintained by you relating in any way whatsoever to the Claim or the Policy, including each "claims file," "underwriting file" and "litigation file," and all other "files" you may maintain relative to the matters that are the subject of this legal action, under whatever designation or description, and every copy or duplicate thereof which may exist within your reasonable custody or control.
>
> [RPD 13]

---

[13] Plaintiff argues that the items requested are "responsive to the RPD 1, 2, 3, 13, 16, and 24, with *specific* reference to 1, 13, 16 and 24." [DE-95] at 2. As plaintiff does not provide any argument with respect to the responsiveness of the documents in question to RPDs 2 or 3, the court considers plaintiff to have waived such arguments. *See Padilla-Ruiz v. Commc'n Techs., Inc.*, 793 F. App'x 200, (Mem)–201 (4th Cir. 2020) ("A party waives an argument . . . by failing to develop its argument—even if its brief takes a passing shot at the issue.") (quoting *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017)).

All documents which constitute or contain claim-handling standards, procedures, guidelines, recommendations, requirements, practices, or policies which Defendants use or have used for handling claims involving first-party residential property losses, which documents were in effect or in use at any time between January 1, 2017 and present. . .

[RPD 16]

[DE-95] at 2-3; [DE-98] at 4.

Plaintiff further asserts that its request for the HR file is responsive to RPD 24, which requests:

All documents constituting employee performance reviews/evaluations of each person who is identified in response to Interrogatory 10 for the time period of January 1, 2015 through present. (Note: (1) This request does seek the relevant writing or other relevant data added as part of the actual reviews, evaluations, or audits, not simply blank forms.)

[RPD 24]

[DE-95] at 2.

## A.    Restriction on RPDs in Case Management Order [DE-41]

Plaintiff argues that the Case Management Order did not put a restriction on the production of documents. [DE-94] at 6. The court finds no merit in this argument. The Case Management Order [DE-41] clearly provides that "the court does not endorse a limitation greater than 25 for [RPDs] under Rule 34, where the parties differ in the number of [RPDs] suggested." [DE-41] at 1, n.1. The instant discovery dispute manifestly shows that the parties differ in the number of RPDs suggested. Moreover, there is no evidence that defendants ever agreed to a higher number of RPDs. *See* [DE-94] at 7 ("if Defendant *would have agreed* to the 36 RPD") (emphasis added). To the contrary, defendant represents that plaintiff "raised no issue with [defendant's] objections to" all RPDs numbered higher than 25. [DE-98] at 2.

Plaintiff notes that it requested 36 RPDs as the "first 11 RPD[s] were merely recitations of

34

the interrogatories." [DE-94] at 7. However, plaintiff has cited no rule or case law to support the principle that the decision to focus the first 11 RPDs in this manner would create a legal basis to correspondingly increase the number of RPDs.

Plaintiff is correct that "Rule 34 does not have a limit on the [RPDs]." [DE-94] at 8. However, this court set a limit on the number of RPDs, absent agreement between the parties, in its Case Management Order. [DE-41]. Accordingly, any argument that the Case Management Order authorizes more than 25 RPDs in this case must fail.

**B.     Non-renewal underwriting documents**

Plaintiff argues that the non-renewal documents are responsive to the first 25 RPDs. Plaintiff notes that defendant raised no objections about producing the entire underwriting file on March 19, 2024, during defendant's 30(b)(6) deposition when plaintiff's counsel specifically inquired about this matter. [DE-94] at 5. Defendant points out that during the depositions the parties stipulated and agreed to the reservation of all objections except for form of the question. [DE-98] at 3. Accordingly, the undersigned does not find that defendant's failure to object to plaintiff's request for underwriting files at the deposition constitutes a waiver or concession in this matter.

Plaintiff argues that the reference to "underwriting files" in RPDs 1 and 13 would include the non-renewal documents. [DE-94] at 8. Plaintiff appears to reason that defendant's contention that the non-renewal underwriting documents do not fall within the scope of the first 25 RPDs is disingenuous, as defendant produced other underwriting documents pursuant to the first 25 RPDs. [DE-94] at 5. Defendant explained that it "does not maintain the policies, guidelines, and procedures for its departments in its customer files." *See* [DE-98] at 8. Even considering the broad scope given to discovery under Rule 26, the undersigned does not find that the reference in RPDs

35

1 and 13 to "each underwriting file" can be read to request policies that may be relevant to such underwriting files, such as the non-renewal documents. The court is not persuaded by plaintiff's argument in this regard.

Plaintiff additionally contends that the non-renewal documents are responsive to RPD 16, which requests "standards, procedures, guidelines, recommendations, requirements, practices, or policies." [DE-94] at 9. However, plaintiff's quotation critically omits that RPD 16 specifically requests "*claim-handling* standards, procedures, guidelines, . . . policies which [d]efendants use or have used for *handling claims* involving first-party residential property losses." [DE-95] at 2-3 (emphasis added); [DE-98] at 4. Plaintiff does not explain how the non-renewal documents fall under the scope of claim-handling documents. Plaintiff cites a "substantial need" for this information. [DE-94] at 9. However, plaintiff has not cited any rule or case law to support how "substantial need" justifies discovery requests that do not fall within the purview of the 25 RPDs allowed by the court.

Accordingly, as the court is also not persuaded by plaintiff's argument here, the court DENIES plaintiff's motion to compel as to the production of the non-renewal documents.

## C.     HR documents

Plaintiff argues that "if [d]efendant would have agreed to the 36 RPD[s that plaintiff suggested], then [p]laintiff's RPD 28 would have required [d]efendant to [p]roduce the HR Files for the adjusters." [DE-94] at 7. However, as noted above, defendant did not agree to the higher number of RPDs, nor did the court allow a higher number. *See* [DE-41] at 1, n.1. Plaintiff also contends that the HR files fall within the purview of RPD 24. [DE-95] at 2.

RPD 24 specifically requests "performance reviews/evaluations." [DE-95] at 2. Defendant does not dispute this. [DE-98] at 6 ("[Defendant] agrees that RPD 24 seeks 'all documents

36

constituting employee performance reviews/evaluations.'"). Defendant notes that it has "has produced the employee performance reviews/evaluations for Erin Crane, the adjuster involved in Plaintiff's 2019 and 2020 claims." [DE-98] at 7. However, defendant "continues to object to producing any employee performance reviews/evaluations for Jim Visconti because he was only involved in Plaintiff's 2017 claim, which is barred by the statute of limitations and supposedly not at issue." [DE-98] at 7.

Regardless of the court's ruling on defendant's statute of limitations argument or the degree to which plaintiff's 2017 claim is still at issue,[14] the court finds that the broad scope of discovery under Rule 26 requires the production of Mr. Visconti's employee performance reviews/evaluations at least as a comparator to the reviews and evaluations of Ms. Crane, another adjuster who worked on one of plaintiff's claims. *See* Fed. R. Civ. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable.").

Accordingly, the court GRANTS plaintiff's motion to compel regarding the production of Mr. Visconti's employee performance reviews/evaluations.

### III. COSTS AND EXPENSES

Defendant's motion to compel requests, *inter alia*, "[t]hat, pursuant to Fed. R. Civ. P. 37(a)(5), the Court require [p]laintiff's counsel to pay [defendant's] reasonable expenses incurred in making this motion, including attorney's fees." [DE-68] at 4; [DE-91] at 5. In its memorandum in support of its motion for protective order, plaintiff "moves for costs and fees associated with having to formulate a response and disallowing the parties to resolve this discovery dispute without court intervention." [DE-72] at 7 (citing Fed. R. Civ. P. 37(a)(5)). Plaintiff's motion to compel

---

[14] The court will consider defendant's motion to amend/correct its answer to include a statutes of limitations defense [DE-86] in a separate order.

requests that the court "award [p]laintiff Sanctions of reasonable attorneys' fees and expenses incurred in filing this Motion." [DE-95] at 3. Defendant's response in opposition to plaintiff's motion to compel requests "reasonable expenses, including attorney's fees, for the time and resources expended in responding to the present motion." [DE-98] at 2. In plaintiff's response in opposition to defendant's motion to compel, he requests "fees associated with responding to [d]efendant's [m]otion to [c]ompel over the recording." [DE-99] at 10.

While the court has found merit in certain of each party's arguments in the motions discussed herein, it also found numerous objections to portions of these motions to be substantially justified for the reasons discussed above. The court notes that defendant failed to meet and confer or request a status conference before filing its motion to compel [DE-68] (*see* [DE-73] at 1),[15] but also notes the bilateral amicable resolution of certain issues raised in the various motions. Based on the circumstances, the court finds that an award of expenses in response to any of the requests referenced above would be unjust. *See* Fed. R. Civ. P. 37(a)(5)(A)(iii). The court therefore declines to make any such award, and each party shall bear its own expenses incurred on its respective motions and responses. For the foregoing reasons, the parties' respective requests for attorney's fees and other expenses are DENIED.

## CONCLUSION

For the reasons discussed above, the court orders as follows:

1.     Defendant's motion to compel [DE-68] is GRANTED IN PART and DENIED IN PART, specifically:

---

[15] The court notes that while plaintiff filed his motion for protective order prior to the telephonic hearing before the court, this was expressly in response to defendant's motion to compel and plaintiff expressly notes in such motion that "[d]efendant failed to comply with the Case Management Order [DE-41] for a telephonic discovery conference, a Meet and Confer, or to permit [p]laintiff reasonable time to formulate a response as it relates to the Greenhill Restoration audio recording." [DE-71] at 1.

a. Defendant's request for additional searches of plaintiff's Dropbox is DENIED, except that defendant is PERMITTED to subpoena Dropbox to determine the name, type, file size and any meta data of any files that have been deleted from plaintiff's Dropbox account since March 11, 2020.

b. Defendant's request for an unredacted copy of the Greenhill Recording is GRANTED.

c. Defendant's request for reasonable expenses, including attorney's fees, incurred in making its motion to compel is DENIED.

2. Plaintiff's motion for protective order [DE-71] is GRANTED IN PART and DENIED IN PART, specifically:

a. Plaintiff's request for protection of the Greenhill Recording is DENIED.

b. Defendant may depose Mr. O'Leary with respect to events that occurred prior to March 26, 2020, but may not depose Mr. O'Leary with respect to any subsequent events protected by Rule 26(b)(4)(D).

c. With respect to any deposition of Mr. O'Leary, the court notes the previous directive in its November 19, 2024 order:

> prior to scheduling of any deposition of Mr. O'Leary in this matter, the parties are DIRECTED to confer with Mr. O'Leary's counsel regarding any physical limitations and appropriate accommodations, if any. If the parties and counsel for Mr. O'Leary are unable to reach an agreement regarding the scheduling of, or appropriate accommodations for, a deposition, counsel for all parties, including counsel for Mr. O'Leary, are DIRECTED to request a telephonic status conference before the undersigned. The parties shall jointly notify the case manager of the undersigned, Deputy Clerk Bobbie Horton, and provide mutually agreed upon suggested dates and times for such conference.

[DE-102].

d. plaintiff's request for costs and fees associated with his motion for protective order is DENIED.

3. Plaintiff's motion to compel [DE-95] is GRANTED IN PART and DENIED IN PART, specifically:

39

    a.      Plaintiff's request for Mr. Visconti's employee performance reviews/evaluations is GRANTED.

    b.      Plaintiff's request for all other HR documents and underwriting documents is DENIED.

    c.      Plaintiff's request for sanctions, to include reasonable attorneys' fees and expenses incurred in filing his motion to compel, is DENIED.

4.    Unless otherwise ordered by the court, the parties shall proceed as ordered in the Joint Scheduling Order [DE-88].

SO ORDERED, this 8th day of January, 2025.

_____
Brian S. Meyers
United States Magistrate Judge