IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:21-CV-197-BO-BM

KEVIN J. LABUDDE,         )
                          )
        Plaintiff,        )
                          )
  v.                      )                O R D E R
                          )
THE PHOENIX INSURANCE COMPANY, )
                          )
        Defendant.        )

This matter comes before the Court on defendant's motion for summary judgment [DE 148], defendant's motions to exclude the testimony of Donald Dinsmore [DE 144] and Jerome Redmond [DE 146], and defendant's motion to seal certain documents [DE 185]. The time to respond to the motions to exclude testimony has elapsed. Plaintiff responded [DE 190] to defendant's motion to seal. Plaintiff also responded in opposition [DE 163] to defendant's motion for summary judgment, and defendant replied [DE 186]. In this posture, the motions are ripe for ruling. For the following reasons, defendant's motion for summary judgment is granted.

## BACKGROUND

Plaintiff LaBudde's residence was damaged by Hurricane Matthew on October 8, 2016. [DE 150, ¶¶ 1, 3]; [DE 164, p. 9–11, ¶¶ 1, 3]. He discovered latent damage in January of 2017, when a pest control company pointed out mold in his crawlspace. [DE 150, ¶¶ 4, 5]; [DE 164, p. 11–12, ¶¶ 4, 5]. He hired Guru 360 Roofing & Restoration, a contractor, to inspect the property for damage. [DE 150, ¶ 7]; [DE 164, ¶ 7]. On February 16, 2017, the contractor filed an insurance claim on plaintiff's behalf with defendant Phoenix, his insurer. [DE 150, ¶9]; [DE 164, p. 12, ¶ 9]. The claim was reported as "wind and hail damage to the roof shingles (about 30), soft metals,

gutters, flashing, walls, foundation and floors, and mold issues." [DE 150, ¶ 9]; [DE 152-3]. Phoenix inspected the property and determined that the roof had been damaged by hail, which was covered under plaintiff's policy. [DE 152-4]. However, Phoenix estimated that the cost of replacing the shingles on the front portion of the roof would be less than plaintiff's deductible, and found plaintiff was not entitled to a payment. *Id.* Phoenix also determined that plaintiff's policy did not cover the reported water intrusion and mold because they were caused by seepage, which was not a covered cause of loss. *Id.*

On December 13, 2019, water intruded into the interior of the office in plaintiff's property. [DE 150, ¶ 35]; [DE 164, ¶ 35]. On December 14, 2019, plaintiff made a second insurance claim. [DE 150, ¶ 36]; [DE 164, ¶ 36]. Phoenix assigned Erin Crane (née Karaffa) to evaluate the claim. *Id.* She inspected the property using a drone to see the roof. [DE 150, ¶¶ 38–39]; [DE 164, ¶ 38]; [DE 152-12, p. 4]. Crane wrote that she could "not determine where the water entry is coming" from or the "cause of the elevated moisture." [DE 152-12, p. 4]. She retained Vertex Engineering to determine the source of the water intrusion. [DE 150, ¶¶ 42–45]; [DE 164 ¶ 45]. Plaintiff, present at the Vertex inspection, expressed to the Vertex engineer that he believed the initial occurrence of this damage was Hurricane Matthew, and the damage had since compounded. [DE 153-3].

The Vertex engineer completed his report on February 7, 2020, which states:

> Based on our investigation, documentation provided by the Insured to Travelers and VERTEX, and within a reasonable degree of engineering certainty, it is the opinion of VERTEX that the appearance of organic growth, moisture staining, elevated moisture levels, and cracks in the interior finishes resulted from deficiencies associated with the construction of the building envelope. It is our opinion that these deficiencies included improper flashing at the windows and roof, improper installation of the water resistive barriers (WRB) and flashings within the perimeter wall cavities, and improper drainage of moisture within the brick veneer drainage cavities.

[DE 154-2, pp. 8–9]. Relying on the Vertex report, Crane spoke with plaintiff on the phone and informed him that Phoenix would not cover the water intrusion. [DE 150, ¶ 58]; [DE 164, ¶ 58]. However, she said that she could set up two separate claims for plaintiff—one for the $5,000 mold remediation limit under his policy, and one for the replacement of his dwelling and shed roof due to hail damage. *Id.* Plaintiff agreed to set up two separate claims. [DE 150, ¶ 60]; [DE 164, ¶ 60]. On March 10, 2020, Crane sent plaintiff an estimate and summary of his payment for the covered portions of his 2019 claim—replacement of the dwelling and shed roofs—and sent a check the same day. [DE 150, ¶ 65]; [DE 164, ¶ 66].

Plaintiff filed this lawsuit on September 9, 2021. His amended complaint asserts claims for (1) breach of contract, (2) unfair claims settlement practices under North Carolina's Unfair and Deceptive Trade Practices Act, and (3) common law bad faith. [DE 57].

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a

reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

DISCUSSION

**I. Statute of Limitations**

Defendant contends that all of plaintiff's claims are time-barred. The statute of limitations for breach of an insurance contract is three years. *See Skyline Restoration, Inc. v. Church Mutual Insurance Co.*, 20 F.4th 825, 830–31 (4th Cir. 2021); N.C.G.S. § 1-52. This three-year time limit begins on the "date of the occurrence of the event out of which the claim for recovery arose." *Marshburn v. Associated Indem. Corp.*, 84 N.C. App. 365, 370 (1987). The statute of limitations for bad faith claims arising out of contract is also three years, and the time also begins at the "date of the occurrence of the event out of which the claim arises." *Lanier v. State Farm Fire & Cas. Co.*, No. 07-cv-129, 2009 WL 926914, at *2–3 (W.D.N.C. Mar. 31, 2009). The statute of limitations for unfair trade practice claims, however, is four years, and the time to file begins "when the insurer rejects coverage to the insured." *Lawley v. Liberty Mut. Grp., Inc.*, No. 11-cv-00106, 2012 WL 4513622, at *7 (W.D.N.C. Sept. 28, 2012).

Hurricane Matthew arrived at plaintiff's house on October 8, 2016, and caused the initial damage to his home. Phoenix denied plaintiff's first insurance claim on February 24, 2017. Plaintiff filed this lawsuit on September 9, 2021, almost five years later. The record is replete with plaintiff's insistence that all the damage arises from Hurricane Matthew, including the damage at

issue in the 2019 claim. *See, e.g.*, [DE 152-12, pp. 3–4]; [DE 153-11]; [DE 164, pp. 27–28, ¶ 25].

As defendant's memorandum in support of its motion for summary judgment puts it,

> Plaintiff claims that all of the damage at the Property results from Hurricane Matthew on October 8, 2016. Phoenix's experts disagree and have opined that the water intrusion, structural damage, and mold resulted from construction defects, seepage, and non-uniform soil movement. However, neither party contends that the damage occurred after October 8, 2016.

[DE 149, pp. 3–4] (internal citations and footnotes omitted).

The three-year statute of limitations for breach of insurance contract, and for bad faith claims arising from insurance contracts, begin to run at the date of loss. There is no dispute that the date of loss occurred more than three years before the filing of this lawsuit. All of plaintiff's claims for breach of contract and bad faith are time-barred.

The four-year statute of limitations for unfair insurance claims settlement practices begins to run on the date the insurance company denies coverage. Plaintiff's legal claim for unfair settlement practices is also time-barred insofar as it relates to his 2017 insurance claim. It is not so clear, however, that the unfair settlement practices claim is time-barred as to his 2019 claim, which he initiated within four years of filing this suit. Defendant argues the 2019 claim, and the two claims Crane set up for plaintiff after the Vertex report issued, are merely duplicative of his 2017 claim, and are also time-barred—but the Court will not reach the question of whether the statute of limitations bars plaintiff's cause of action for unfair claims settlement practices as to those later insurance claims.

## II. Unfair Insurance Claims Settlement Practices

"In order to establish a violation of N.C.G.S. § 75-1.1, a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." *Gray v. North Carolina Ins. Underwriting Ass'n*, 352 N.C. 61, 68 (2000). "A practice

is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 302 N.C. 539, 548 (1981). "[A] practice is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required." *Id.* A breach of contract is not an act that qualifies as unfair or deceptive under the UDTPA. *Barbour v. Fidelity Life Ass'n*, 361 F. Supp. 3d 565, 573 (E.D.N.C. 2019). "[I]f substantial aggravating circumstances accompany a breach of contract, then those circumstances can create a UDTPA claim." *Waterford I at Cary Park Condo. Homeowners Ass'n, Inc. v. Nationwide Prop. & Cas. Ins. Co.*, 669 F. Supp. 3d 531, 536 (E.D.N.C. 2023).

### a. Motions to Exclude Expert Testimony

Defendant moved to exclude testimony and reports provided by plaintiff's experts. Because all claims except plaintiff's UDTPA claim are time-barred, most of the testimony and reports are irrelevant, and the motions to exclude them are moot. However, portions of the testimony and reports of plaintiff's expert Donald Dinsmore bear on the UDTPA claim. The Court concludes these materials pertaining to the UDTPA claim should be excluded based on Fed. R. Evid. 702, and the motion to exclude evidence is therefore granted in part.

Expert testimony on an ultimate issue is excludable under Rule 702 if it is not helpful to the trier of fact. *Kopf v. Skyrm*, 993 F.2d 374, 377–78 (4th Cir. 1993). "Expert testimony that merely states a legal conclusion is less likely to assist the jury in its determination." *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002). "The role of the district court, therefore, is to distinguish opinion testimony that embraces an ultimate issue of fact from opinion testimony that states a legal conclusion." *Id.* "The best way to determine whether opinion testimony contains legal conclusions, 'is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.'" *Id.* (citing *Torres v. Cnty. Of*

*Oakland*, 758 F.2d 147, 151 (6th Cir. 1985); *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997).

Dinsmore's expert report [DE 145-2, pp. 4–5] opines that Phoenix failed to meet the industry standards for proper handling of residential property claims. Dinsmore explains that the industry standards to which he refers are those set out by the model code of the National Association of Insurance Commissioners (NAIC). The NAIC model code was adopted by North Carolina and enacted into law (with minor differences not applicable here). Therefore, in essence, when Dinsmore opines on insurance industry standards, he is effectively stating his opinion as to what standards the law imposes.

This view of Dinsmore's opinion is further supported by the language of his supplemental expert report [DE 145-3]. The eighth opinion he expressed in that report lists six specific alleged violations, which are almost verbatim quotations from N.C.G.S. § 58-63-15(11)(a)–(n). In his deposition, he acknowledged the language he used was intended to cite the terminology used in the NAIC model code. [DE 145-7, pp. 72–78]. The terminology he used in that report has only legal meaning, and no independent or specialized industry meaning, which indicates that his opinion states unhelpful and impermissible legal conclusions. The motion to exclude Dinsmore's testimony is granted insofar as his testimony bears on plaintiff's UDTPA claim for unfair claims settlement practices.

### b. *Plaintiff's UDTPA Claim*

Plaintiff bases his UDTPA claim, generally, on Phoenix's denial of covered damages and alleged failure to properly investigate his insurance claim. *See* [DE 57, ¶ 73]. Although the complaint spends nearly five full pages alleging Phoenix's acts or omissions that purport to embody unfair and deceptive practices, that list boils down to the following: plaintiff alleges

Phoenix failed to consider the documents he provided, misled the engineer who investigated the water intrusion, provided Crane with insufficient tools to conduct her investigation, failed to explain to plaintiff the meanings of certain terms of the policy, failed to timely respond to plaintiff's complaints, and failed to clearly affirm or deny coverage.

If Crane had insufficient tools to investigate plaintiff's 2019 claim for water intrusion, this defect was cured when Crane recognized that she could not identify the source of the water and retained Vertex Engineering to investigate. Vertex's investigation included "an onsite interview with the Insured." [DE 154-2, p. 1]. Crane also emailed plaintiff's pictures to the Vertex engineer. [DE 153-10]. Phoenix did not withhold plaintiff's version of the story from Vertex, and there can be no genuine dispute that Phoenix allowed plaintiff's research and opinion to be considered. After outsourcing the investigation to Vertex, Crane relied on Vertex's assessment and communicated with plaintiff promptly when Vertex completed its work.

Nor did Phoenix violate the UDTPA by failing to clearly affirm or deny coverage. True, there is no letter in the record from Phoenix to plaintiff explaining the outcome of his 2019 claim, as there is regarding his 2017 claim. But after receiving the Vertex report, Crane spoke with plaintiff on the phone and communicated Phoenix's position. [DE 150, ¶ 58]; [DE 164, ¶ 58]. Thereafter, plaintiff wrote to Crane disputing findings in the Vertex report [DE 57-21] and called the North Carolina Department of Insurance to report potential fraud. [DE 154-9]. Plaintiff's response evidences his understanding that Phoenix was denying parts of his claim.

Finally, the complaint alleges that Phoenix engaged in an unfair or deceptive trade practice by failing to explain the meanings of certain policy terms like "concurrent causation" or "ensuing loss." Defendant contends that plaintiff never asked about their meanings. [DE 149, p. 24]. Plaintiff swept past this issue in his memorandum in opposition to summary judgment, remarking only that

the "evidence speaks for itself." [DE 163, p. 8]. The Court detects no dispute regarding whether Phoenix refused to answer plaintiff's questions about the policy. "Phoenix is not required to explain every insurance concept and coverage under the Policy to every policyholder regardless of its relevance to a claim." [DE 149, p. 24].

### III. Defendant's Motion to Seal Documents

A judicial record is subject to the public's common law right of access, at a minimum, and might be subject to the heightened right of access afforded by the First Amendment. *Bayer Cropscience Inc. v. Syngenta Crop Prot.*, LLC, 979 F. Supp. 2d 653, 655 (M.D.N.C. 2013). Where a party seeks to seal documents filed in connection with summary judgment, the "more rigorous" First Amendment standard applies. *Virginia Dep't of State*, 386 F.3d at 576. Under this standard, a court "may restrict access only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Id.* at 575 (internal quotation and citation omitted). In considering a motion to seal, a court should provide the public with notice of the request to seal and support its decision by specific findings, including whether alternatives to sealing are appropriate. *In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984). "One exception to the public's right of access is where such access to judicial records could provide a 'source[] of business information that might harm a litigant's competitive standing.'" *Woven Elecs. Corp. v. Advance Group, Inc.*, 1991 U.S. App. LEXIS 6004, *17 (alterations in original) (quoting *Nixon v. Warner Communications*, 435 U.S. 589, 598 (1978)).

Defendant moved to seal [DE 185] several exhibits which have been marked as confidential pursuant to the protective order filed in this case. Plaintiff filed these exhibits alongside his memorandum in opposition to defendant's motion for summary judgment. Defendant argues the exhibits contain proprietary information and trade secrets, and that defendant's interest in keeping

the information confidential outweighs the common law and First Amendment presumptions to a public right of access. Plaintiff opposes sealing. He argues the exhibits were overbroadly designated as confidential and defendant has not provided specific justifications for the sealing of the individual exhibits.

The motion to seal has been pending for some time and no member of the public has objected. Defendant explains in its memorandum in support of its motion to seal that "these exhibits include proprietary details regarding the functioning of rate, deductible, premium, and coverage programs; claim, intake, routing, and internal communications policies; sensitive business communications containing internal assessments and reasoning for deductible increases; physical locations where certain discounts and deductibles are provided; and internal methods of analyzing claims and disputes." [DE 189, p. 4]. Because "many of the documents are brief and reference confidential matters throughout," less drastic alternatives to sealing would be insufficient to protect defendant's proprietary information. Therefore, the motion to seal is granted.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [DE 148] is GRANTED. Defendant's motion to exclude the testimony of Jerome Redmond [DE 146] is DENIED as MOOT. Defendant's motion to exclude the testimony of Donald Dinsmore [DE 144] is DENIED IN PART as MOOT, except to the extent that it opines on plaintiff's unfair and deceptive trade practices claim, to which extent it is GRANTED IN PART. Defendant's motion to seal [DE 185] is GRANTED.

SO ORDERED, this 10 day of December 2025.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE